Lorisa Capital Corporation, Respondent, v Giacomo Gallo et al., Defendants, and James St. Furcy, Appellant.

Second Department, August 4, 1986

APPEARANCES OF COUNSEL

*Carl O. Callender (Betty E. Staton* and *Thomas More Griffin* of counsel), for appellant.

*David J. Rosenblum* for respondent.

### OPINION OF THE COURT

GIBBONS, J. P,

■ ■ At issue on this appeal is (1) whether a power of attorney which conferred limited realty management powers upon James St. Furcy was one "relating to an interest in a decedent's estate" and was therefore ineffective under EPTL 13-2.3 for failure to record it in the Surrogate's Court, and (2) whether plaintiff Lorisa Capital Corporation, a corporation

dissolved by proclamation of the Secretary of State for non-payment of franchise taxes in 1978, had capacity to bring this action to enforce obligations arising out of prohibited new business conducted five years after dissolution. We conclude that the power of attorney was not ineffective for failure to record in the Surrogate's Court, and that the plaintiff lacked the capacity to institute this action.

In this foreclosure action, instituted in September 1983 by service by publication upon the named defendants Melina Mentor (deceased) and Giacomo Gallo, the appellant James St. Furcy sought to vacate a default judgment of foreclosure and sale dated February 24, 1984, and an order of possession dated September 18, 1984, and to dismiss the action. His motion was denied without reaching the merits upon the ground that he lacked standing as a tenant to challenge the foreclosure. Further, a power of attorney, authorizing him to act in a limited capacity for a foreign citizen who alleged ownership of the subject premises through intestate succession, was declared void for failure to record it in the Surrogate's Court.

## THE PARTIES

Appellant James St. Furcy was a long-time friend of the deceased defendant Melina Mentor, and has resided at 1110 Lincoln Place in Brooklyn, the subject premises, since 1978. He is the attorney-in-fact for Ferdinand Antoine, a citizen and resident of Haiti, who asserts an ownership interest in the subject premises by operation of law through intestate succession.

The named defendant Melina Mentor is an American citizen who died in Haiti in 1979. She purchased the premises at 1110 Lincoln Place in 1960 and remained the sole owner of record until 1983, notwithstanding an intervening marriage to Abdul Antoine in 1971 and her death in 1979.

Ferdinand Antoine alleges that he is the brother of Abdul Antoine, the husband of the deceased, Melina Mentor. He is St. Furcy's principal and claims ownership of the subject premises as of 1980, as the sole heir of his brother Abdul Antoine who allegedly died intestate at that time.

The defendant Giacomo Gallo is the current owner of record who took title to the premises in January 1983 from one Anton Mentor. Anton Mentor was not a record owner, and, according to St. Furcy, despite his having the same surname as Melina Mentor, is not related to her.

The plaintiff Lorisa Capital Corporation (hereinafter Lorisa) is a dissolved corporation which took a mortgage in the amount of $31,697.07 from Gallo one month after the recorded conveyance from Anton Mentor, notwithstanding that there was a break in the chain of title. Gallo immediately defaulted on the mortgage payments, and Lorisa claims that his whereabouts are presently unknown. Notwithstanding the facts that Melina Mentor had died more than four years prior to the commencement of this action and that no representative was appointed, Lorisa apparently named her as a party defendant based upon the contemporaneous (Nov. 1982 and Feb. 1983) assignment of two recorded mortgages in the amounts of $8,660 and $1,000, respectively, executed by her approximately 22 years earlier, and allegedly remaining unsatisfied.

In sum, Lorisa's default judgment is based upon nonpayment of one substantial mortgage taken from a mortgagor who did not have clear record title, who immediately defaulted and disappeared, and whose ownership interest is actively challenged by St. Furcy's principal. It is further based upon two record mortgages executed by the only uncontested owner of record almost 22 years earlier and assigned by the mortgagees to Lorisa five years after Melina's death. It is asserted by St. Furcy, and he documents his claim, that he secured a satisfaction of the $8,660 mortgage in August 1980. His possession of the premises, at the very least, raises a question as to constructive notice of the satisfaction and therefore Lorisa's status as a bona fide assignee.

That leaves the $1,000 mortgage executed by Melina Mentor in 1960 as the only, thus far, uncontroverted foundation for Lorisa's foreclosure action. Curiously, by its terms, final payment on this latter obligation was due in December 1963. Thus, it might be subject to discharge of record as of December 1983 as an "ancient mortgage", i.e., one which has not been discharged of record within 20 years after the debt was due, and is presumed to have been paid, in the absence of proof to the contrary (see, RPAPL 1931; Matter of Zimmerman, 21 Misc 2d 1048, 1049; Matter of Bryan, 210 App Div 93). Moreover, since the record is silent as to when any payment was last made on this obligation, the six-year Statute of Limitations applicable to foreclosure actions may have run as against the estate of Melina Mentor and her successors in title (see, CPLR 213). It is clear that any extension agreement executed by Gallo would bind only Gallo in reviving the Statute of Limitations, and, thus, only insofar as Gallo may

have rights in the property does the action appear to have any foundation. And, as is disturbingly apparent, for all this record discloses, both Gallo and Lorisa could be interlopers whose alleged title and mortgage interest have no substance.

We recite the following facts to illustrate the apparent merit of St. Furcy's claims and the clear possibility that Lorisa held no valid interest in the subject premises.

Lorisa filed the summons and complaint in this action with the Kings County Clerk on June 16, 1983.

In addition to Giacomo Gallo, Melina Mentor and the State of New York, Lorisa named as defendants "John Doe #1" to "John Doe #8", parties who have an interest in the mortgaged premises as tenants or otherwise. Unable to serve either Gallo or Mentor, Lorisa sought and received leave to amend the summons and complaint and to effect service by publication. Appointment of a guardian ad litem was also secured to protect possible interests of potential infants, incompetents or members of the military. Lorisa's proposed supplemental complaint falsely alleged that it was a duly organized *and existing* corporation under the laws of New York State. In support of its request for foreclosure, Lorisa alleged the following facts. On December 8, 1960, Melina Mentor executed a bond and mortgage to Nordale Realty Corporation in the sum of $8,660 to be paid in monthly installments of $65 for a period of five years, at the expiration of which the balance was to become due and payable. Nordale assigned the mortgage to Adella Butts the same year. In late 1982, almost 22 years later, Adella Butts assigned the mortgage to Lorisa, and Lorisa recorded the assignment on January 26, 1983. It is this mortgage which St. Furcy's evidence indicates is satisfied.

Melina Mentor also executed a second bond and mortgage to Stanley Downer on December 16, 1960, in the sum of $1,000 to be paid in monthly installments of $30 for a period of three years, at the expiration of which the balance was to become due and payable. In early 1983, approximately 22 years later, Stanley Downer also assigned his mortgage to Lorisa, which recorded that assignment on February 23, 1983. On the same date, Giacomo Gallo executed a bond and mortgage to Lorisa in the sum of $31,697.07. Lorisa recorded the Gallo mortgage on March 4, 1983.

Lorisa additionally alleged that by agreement (apparently

with Gallo and clearly not with Melina Mentor) dated February 23, 1983, the three mortgages were consolidated to form a single lien on the property in the amount of $40,000 to be paid in monthly installments of $633.15. The consolidation and extension agreement was recorded on March 15, 1983. Finally, Lorisa alleged that Melina Mentor and Giacomo Gallo had defaulted in all payments, although duly demanded.

Subsequently, following service by publication and default by Gallo and Melina Mentor, the matter was sent to a Referee deleting the John Doe tenant defendants as they were not indispensable parties.

A default judgment of foreclosure and sale followed in February 1984. Significantly, the printed form portion of the judgment contained a typewritten decretal paragraph directing that the premises "be sold subject to * * * rights, if any, of tenants, to the extent only that said rights may be controlling".

Lorisa thereafter secured an order of possession dated September 18, 1984, which directed the Sheriff to eject St. Furcy from the premises.

St. Furcy moved by order to show cause to vacate the default judgment of foreclosure and sale, to vacate the order of possession, and to either dismiss Lorisa's action or set the matter down for a hearing.

As an excuse for his default, St. Furcy asserted that he first learned of these proceedings in May and June of 1984 when he received a notice to quit and notice of Lorisa's motion for an order of possession. He appeared on the original return date of that motion only to learn that the matter had been adjourned to July 14, 1984. On July 14 he arrived late at the courthouse and was informed that the order of possession had been granted upon his default.

In support of the merits of his position, St. Furcy initially recounted the history of his association with Melina Mentor and the subject premises.

In early 1978 Melina Mentor, a close friend, approached him to help her redeem the premises at 1110 Lincoln Place which had been the subject of foreclosure by the City of New York in 1977. In exchange for his redeeming the property and paying the back taxes and making mortgage payments, he took possession. St. Furcy documented his claim that he redeemed the property from the City of New York in 1978. He also made the final mortgage payment to Adella Butts and

received a satisfaction from her in 1980 (also documented). St. Furcy offered other documentary evidence which included a deed to Melina Mentor dated in 1960, her 1971 certificate of marriage to Abdul Antoine, the death certificate of Melina Mentor as well as a consul's report of her death, and a title abstract for 1110 Lincoln Place.

St. Furcy also offered the power of attorney executed by Ferdinand Antoine which is central to the issue of standing. That document indicated that Ferdinand Antoine is the sole heir of Corneille Abdul Antoine who died in New York in 1980. It essentially appointed St. Furcy to act as a managing agent of the subject property, to pay taxes and expenses and to take possession of the apartments, by eviction, if necessary.

It was St. Furcy's contention that the premises at 1110 Lincoln Place passed by operation of law, *inter alia,* to Abdul Antoine upon the death of his wife Melina Mentor, and to Ferdinand Antoine upon the death of his brother Abdul, under the rules of intestate succession *(see,* EPTL 4-1.1 [a] [2], [7]). He further asserted that the Butts mortgage could not have been assigned to Lorisa in 1982 when it had been satisfied in 1980 and that if the $1,000 Downer mortgage had not been satisfied, it was because no demand was made. He asserted that the Gallo mortgage was invalid as the record did not show that Gallo took title from one legally entitled to convey. St. Furcy alleged that he knew of no relative of Melina Mentor named Anton. Moreover, he contended, even if Anton Mentor was a distributee, Melina Mentor's estate had never been settled, and, thus, no one had authority to convey the premises.

Relying on his power of attorney and status as a tenant, St. Furcy also sought a dismissal of the foreclosure action on the ground that Lorisa lacked legal capacity to bring the action, having been dissolved by the Secretary of State in 1978 for failure to pay franchise taxes *(see,* Tax Law § 203-a).

In opposition, Lorisa questioned St. Furcy's standing to challenge the action and judgment on the basis that his power of attorney was one "relating to an interest in a decedent's estate" and, pursuant to EPTL 13-2.3, was void for failure to record it with the Surrogate. Regarding its own corporate status, Lorisa asserted that the transactions supporting the foreclosure action were conducted in the course of winding up its corporate affairs, and, thus, it had capacity to sue pursuant to Business Corporation Law § 1006 (a) (4). In the alternative,

Lorisa offered to pay the outstanding back taxes and revive the corporate entity, if necessary.

■ By order entered January 14, 1985, Special Term held that St. Furcy was "a mere tenant in the subject premises with no right to raise defenses to the underlying foreclosure action" based upon his failure to record his power of attorney with the Surrogate's Court pursuant to EPTL 13-2.3. We reverse.

## I

We hold that the power of attorney held by St. Furcy was not governed by EPTL 13-2.3, and therefore was not ineffective for failure to record in the Surrogate's Court.

EPTL 13-2.3 (a) states: "(a) Every power of attorney relating to an interest in a decedent's estate and every conveyance or assignment of an interest in an estate, or similar instrument, which contains an express or implied authorization or delegation of power to act thereunder shall be in writing and acknowledged or proved in the manner prescribed by the laws of this state for the recording of a conveyance of real property and, subject to the rules or order of the surrogate hereinafter provided, shall be recorded in the office of the surrogate granting letters on such decedent's estate or, if no such letters have been granted, in the office of the surrogate having jurisdiction to grant them. Such recording confers on the surrogate jurisdiction over the grantor of such power of attorney, the attorney in fact therein named and any other person acting thereunder. No attorney in fact named in any power of attorney or in such other instrument nor any person acting thereunder shall perform any act under such instrument unless it has been duly recorded". The statute further provides that the Surrogate may determine the validity of any such instrument and require proof of the amount of compensation to be charged by an attorney-in-fact, may determine the reasonableness of such compensation or fix such compensation, and may exact a bond or undertaking to assure the payment of funds to the principal (EPTL 13-2.3 [b]).

On its face, EPTL 13-2.3 appears to apply only to proceedings in the Surrogate's Court and the distribution of estates through powers of attorney, as it confers upon the Surrogate the power and jurisdiction to closely supervise and regulate the conduct of attorneys-in-fact who represent principals with an interest in an estate. It also appears to operate as a notice

statute with regard to conveyances or assignments of an interest in an estate (see, Matter of Bihn, 171 Misc 80). Since we are not concerned with a conveyance or assignment in this case, the notice purpose of the statute is not implicated here. However, the recording requirement for powers of attorney appears to have no application except in proceedings in the Surrogate's Court, as that court has proper jurisdiction over the distribution of estates.

A review of the legislative history and source of EPTL 13-2.3 and the purposes sought to be achieved confirms these conclusions.

Personal Property Law § 32-a (added by L 1935, ch 203, as amended by L 1936, ch 203), repealed in 1966 and reenacted as part of the 1966 revision of the Estates, Powers and Trusts Law (EPTL 14-1.1 [a]), is the source of EPTL 13-2.3. The revisor's notes indicate that it was reenacted without substantive change (see, 6th & Final Report of Temp St Commn on Law of Estates [1967 NY Legis Doc No. 19] Appendix L, at 250). The original bill was introduced in 1935 to address notorious conditions then existing. A measure was necessary to curb abuses by persons securing powers of attorney from foreign heirs of decedents for exhorbitant fees and without rendering proper service (see, report of Thomas W. Chrystie, New York County Lawyers' Association Committee on Legislation, Legis Bill Jacket, L 1935, ch 203).

The report by the New York County Lawyers' Association in support of the legislation, to illustrate the need for corrective measures, quoted Surrogate Foley's revealing description in Matter of Lynch (154 Misc 260, 264) as follows: "The system of soliciting known heirs or known legatees in estates has been the subject of complaint by the Consuls of the various countries in New York and by reputable attorneys representing executors and administrators. It is charged that beneficiaries, who would have received their shares of estates in the ordinary course and without any deduction for attorney's fees or for the compensation of solicitors, have been imposed upon by foreign agents to sign unconscionable and exhorbitant agreements to pay, and to execute accompanying powers of attorney. Cases have arisen, where foreign legatees or heirs, who would have received their shares in the full amount, have been led into signing agreements to pay as high as fifty per cent of the money due them. It is also charged that the foreign solicitors deduct an amount in excess of the agreed compensation. It is claimed that there has been delay in

transmission and payment and that in some cases there has been embezzlement of the moneys. It is asserted that the foreign agent in Poland of a New York company converted over $100,000. *Certainly such a system should not be tolerated in probate courts under their policy to protect beneficiaries of estates from imposition or unnecessary expense"* (emphasis added).

In the *Lynch* case, the Surrogate held that the power of attorney and compensation agreement procured by Henry Gordon, who had previously obtained powers of attorney in approximately 110 estates in the Surrogate's Courts of New York, Kings, Westchester, Queens, and Bronx Counties, were illegal and void *(Matter of Lynch, supra,* at p 263). Decisional law subsequent to the passage of Personal Property Law § 32-a confirms that the primary purpose of that section was to " 'curtail the abuses that might arise between persons acting under a power of attorney and their principals' " *(see, Matter of Robinson,* 52 Misc 2d 163, 164, *affd* 30 AD2d 702, *appeal dismissed* 22 NY2d 938; *Matter of Bargel,* 5 Misc 2d 657, 659, *affd* 7 AD2d 645; *cf. Matter of Garrity,* 164 Misc 910, 911).

Thus, the legislative history and decisional law support a conclusion that EPTL 13-2.3 was intended to protect distributees in the Surrogate's Court from practices which unduly diminish their undistributed interests in estates. Accordingly, the recording requirement would serve no purpose in any but the Surrogate's Court, and the phrase "[e]very power of attorney relating to an interest in a decedent's estate" in EPTL 13-2.3 (a) cannot be read so broadly that it encompasses the power of attorney at bar, because in this case there never was any Surrogate's Court proceeding and the property passed by operation of law to the distributee or distributees subject only to estate transfer tax and such other encumbrances as may lawfully be asserted.

In analyzing the nature and scope of a power of attorney, the courts should look to the nature of the powers conferred and the purposes of the agency relationship *(see, e.g., De Ibero v De Ibero,* 33 AD2d 804; *Matter of Robinson,* 52 Misc 2d 163, *affd* 30 AD2d 702, *appeal dismissed* 22 NY2d 938, *supra;* 1 Warren's Weed, New York Real Property, Attorney-In-Fact, § 3.01). In our opinion, the power of attorney at bar was limited to the performance of realty management functions which would reasonably include the payment of mortgage debts and, necessarily, defense against unjust or satisfied

claims against the property on behalf of an absentee owner who could not do so for himself. The power does not relate "to an interest in a decedent's estate" within the meaning of EPTL 13-2.3, as the exercise of the power could not take, alter or alienate such an interest. Therefore, St. Furcy did have standing to challenge the judgment of foreclosure. Furthermore, the record reveals that he proffered a reasonable excuse for delay and a prima facie showing of a meritorious defense to foreclosure. Moreover, by St. Furcy's possession of the premises Lorisa had constructive notice of any right he could establish to the premises (see, 1 Rasch, New York Landlord & Tenant—Summary Proceedings § 10 [2d ed]; *Phelan v Brady,* 119 NY 587; *City Bank v Hocke,* 168 App Div 83; Real Property Law § 223). Consequently, Special Term erred in denying his motion to vacate the default judgment of foreclosure and sale and the order of possession after sale (CPLR 5015 [a] [1]).

## II

Having determined that St. Furcy's power of attorney was not void for failure to record it in the Surrogate's Court, we now turn to his unaddressed claim at Special Term that Lorisa lacked capacity to sue.

Upon dissolution, a corporation's legal existence terminates (Lattin, Corporations § 183, at 642 [2d ed]). This rule is qualified by statute to provide that a corporation retains a limited de jure existence for the purpose of winding up (Business Corporation Law § 1005 [a] [1]; § 1006). Lorisa acknowledges that it was dissolved in September 1978 pursuant to Tax Law § 203-a by a proclamation of the Secretary of State for nonpayment of franchise taxes. Its complaint alleged that in 1983 it first acquired rights to the mortgages in suit, four years and five months after its statutory dissolution. At Special Term, Lorisa maintained that it acquired those mortgages in the course of winding up its corporate affairs. It has abandoned that argument on appeal. Accordingly, we consider whether a corporation, dissolved pursuant to Tax Law § 203-a, has capacity to bring suit on a claim arising out of the conduct of prohibited new business (see, Business Corporation Law § 1005 [a] [1]).

■ Statutory dissolution by proclamation of the Secretary of State pursuant to Tax Law § 203-a is intended to encourage

voluntary[1] payment of franchise taxes *(see, Bowditch v 57 Laight St. Corp.,* 111 Misc 2d 255). After dissolution, a delinquent corporation retains a limited de jure existence solely for the purpose of winding up its affairs, and retains capacity to bring suit for that purpose *(see,* Tax Law § 203-a [10]; Business Corporation Law §§ 1009, 1006). All new business is prohibited (Business Corporation Law § 1005 [a] [1]). Accordingly, a corporation is encouraged to pay franchise taxes, as delinquency for a period of two years in either filing a franchise tax report or paying the taxes due will result in dissolution and forfeiture of the corporate charter *(see,* Tax Law § 203-a [1], [2], [3]). The statutory scheme is further designed to encourage voluntary compliance by providing that a delinquent corporation may be reinstated nunc pro tunc upon the filing of a certificate of the Tax Commission stating that all franchise taxes, penalties and interest charges have been paid (Tax Law § 203-a [7]). Payment of such preproclamation indebtedness by a corporation which has failed to cease its business activities may not be avoided by an attempt to reincorporate *(D & W Cent. Sta. Alarm Co. v Copymasters, Inc.,* 122 Misc 2d 453). It is apparent from the statutory scheme that the Legislature did not intend a delinquent corporation which has not sought reinstatement to enjoy the privileges of corporate existence, which include the right to acquire a mortgage interest and the right to bring suit in the courts of this State *(see, Seventy-Three First Ave. Corp. v Braunstein Bros. Carbonic Sales Corp.,* 168 Misc 842, *affd* 170 Misc 657; Note, *Dissolution and Suspension as Remedies for Corporate Franchise Tax Delinquency: A Comparative Analysis* [hereinafter *Corporate Tax Delinquency],* 41 NYU L Rev 602, 612, 617). Lorisa advances several theories to avoid that result and dismissal of its case, including the doctrine of de facto corporations, estoppel theory, and the unavailability under Business Corporation Law § 203 of the ultra vires defense. We find none of Lorisa's arguments persuasive.

First, a delinquent corporation may not avail itself of the de facto doctrine to preclude third parties from challenging its capacity to sue. De facto recognition requires both a good-faith exercise of corporate powers and colorable compliance with

---

1. The large number of corporations that become delinquent each year renders a system dependent upon State-initiated collection methods administratively and economically unworkable. As of 1966, between 9,000 and 13,000 corporations were dissolved in New York each year *(see, Dissolution and Suspension as Remedies for Corporate Franchise Tax Delinquency: A Comparative Analysis,* 41 NYU L Rev 602, 603, n 8).

the enabling statute *(see,* Lattin, Corporations § 57, at 184 [2d Ed]; *Corporate Tax Delinquency,* 41 NYU L Rev 602, 613; *Garzo v Maid of Mist Steamboat Co.,* 303 NY 516 [de facto status recognized where good-faith exercise of corporate powers, including the payment of dividends and taxes, followed inadvertent failure to timely file certificate extending corporate life under enabling statute]). A delinquent corporation lacks both prerequisites. There is neither a good-faith exercise of corporate duties, nor compliance with statutes requiring the payment of franchise taxes for the privilege of conducting business in the corporate form (Tax Law § 209). Moreover, a corporation's de jure existence is removed for the very purpose of securing compliance with the tax statute. Recognition of de facto status would directly subvert the effectiveness of the sanctions for franchise tax delinquency, removing all incentive for a dissolved corporation to seek reinstatement *(cf. Garzo v Maid of Mist Steamboat Co., supra* [recognition of de facto status furthered legislative intent of then General Corporation Law § 49]). As it has been previously stated: "A corporation dissolved under [Tax Law] section 203-a is legally dead and can no longer sue * * * except in the limited respects specifically permitted by the statute. Its existence has been terminated and it is not even a *de facto* corporation" *(Brady v State Tax Commn.,* 176 Misc 1053, 1055, *affd* 263 App Div 955; *see also, Delpad Realty Corp. v Rapport,* 119 NYS2d 675).

We agree.[2] We further acknowledge that there is some question regarding the First Department's position on this issue, and to the extent that de facto status may be recognized in that Department as enabling delinquent corporations to sue or contract, we decline to follow *(compare, National Bank v Paskow,* 75 AD2d 568, 569, *affd* 53 NY2d 953 [Florida corporation dissolved for nonpayment of taxes continued as de facto corporation. However, the corporation was not a plaintiff, and, thus, capacity was not in issue.] *with Igbara Realty Corp. v New York Prop. Ins. Underwriting Assn.,* 94 AD2d 79, 80, *mod on other grounds* 63 NY2d 201 [if delinquent corporation not engaged in winding up affairs, defense of lack of capacity to sue may have merit]).

We further find that Lorisa may not assert any estoppel theory against St. Furcy. Although one dealing with a delin-

---

2. We expressly acknowledge that a different case may be presented where a corporation is dissolved because of a clerical error by a government agency *(see, A.A. Sutain, Ltd. v Montgomery Ward & Co.,* 22 AD2d 607, 609, *affd* 17 NY2d 776).

quent corporation should be permitted to avoid wholly executory contracts that relate to prohibited new business activity *(see, Corporate Tax Delinquency,* 41 NYU L Rev 602, 608 ["Such a rule would promote the statutory scheme because a corporation's contracts could be avoided unless it paid its taxes"]), other considerations arise where the contract is fully or partially executed. The statute was not designed to permit parties to avoid a contract after receiving the benefits of performance. Such avoidance might result in financial detriment to the delinquent corporation, thus, impairing its ability to pay both its taxes and creditors. In such case, one who has received the benefits of performance should be estopped from instituting suit to avoid the contract. However, if the delinquent corporation is permitted to institute suit to enforce such contracts before its taxes are paid, the statute's effectiveness will be impaired *(see, Corporate Tax Delinquency,* 41 NYU L Rev 602, 608; *cf. Delpad Realty Corp. v Rapport,* 119 NYS2d 675, *supra; but see, Expomotion, Ltd. v Heidepriem-Santandrea, Inc.,* 101 Misc 2d 593). Although Lorisa never dealt with St. Furcy and thus could not claim that he was estopped from raising its incapacity to sue, a different matter is presented concerning another named defendant—Giacomo Gallo. Having dealt with Gallo, and Gallo allegedly having received full performance from Lorisa, Lorisa might argue that this action is still viable as against Gallo, as he would be estopped from raising Lorisa's incapacity to sue. As we have noted, a third party should not be able to avoid its obligations after receiving performance from a delinquent corporation. On the other hand, if a delinquent corporation, as a plaintiff, could assert an estoppel theory against such a defaulting party, the purposes of the tax statute would be subverted as no incentive for payment of taxes and reinstatement would remain. Our preferred resolution adequately addresses both concerns, as it requires the delinquent corporation to seek reinstatement before it can institute suit to prevent those with whom it has contracted from avoiding their obligations.

The greatest potential for prejudice to the delinquent corporation, as a result of its incapacity to sue, lies in the possibility that the applicable Statute of Limitations may pass in the period between the dismissal of its initial action for lack of capacity and the renewal of that action after payment of its unpaid taxes. Yet since the dismissal is not due to a voluntary discontinuance, a failure to prosecute or a final judgment on the merits, the six-month grace period of CPLR 205 is applica-

ble to this situation and mitigates this potential for prejudice *(cf. George v Mt. Sinai Hosp.,* 47 NY2d 170). Consequently, allowing a litigant to assert this affirmative defense against a delinquent corporation will advance the purposes of Tax Law § 203-a with minimal prejudice to the corporate plaintiff.

We note that should Lorisa pay its back taxes as it offered to do in its papers at Special Term, and, thus, be reinstated to de jure status nunc pro tunc, its contracts entered into during the period of delinquency would be retroactively validated. By statute, the corporate powers, rights, duties and obligations are reinstated nunc pro tunc, as if "such proclamation [of dissolution] had not been made or published" (Tax Law § 203-a [7], [8]). Moreover, once the delinquent corporation has paid its taxes and penalties, "it serves no revenue purpose to permit avoidance of corporate contracts executed during delinquency" *(see, Corporate Tax Delinquency,* 41 NYU L Rev 602, 608 ["A majority of states that have considered this problem have ruled that such contracts are retroactively validated"]; *see, Bowditch v 57 Laight St. Corp.,* 111 Misc 2d 255, 259, *supra; cf. A.A. Sutain, Ltd. v Montgomery Ward & Co.,* 22 AD2d 607, 609-610, *affd* 17 NY2d 776). As noted, the fact that Lorisa may be reinstated to viable corporate status, and thereby secure retroactive validation of its contracts, will not resolve the issues in this foreclosure action, but merely initiate consideration of the multifaceted problems that appear from the record to constitute a deficiency in its interest in the property.

We now turn our attention to the third theory offered to sustain Lorisa's capacity. One commentator has relied upon Business Corporation Law § 203 to advance the view that a claim arising out of the conduct of prohibited new business by a delinquent corporation should be enforceable, as the delinquent corporation enjoys a de facto status and, under Business Corporation Law § 203, the defense of ultra vires conduct is available only in specifically enumerated circumstances to shareholders and the Attorney-General *(see,* 4 White, New York Corporations § 1006.08). First, the defense of ultra vires conduct goes to the validity of an action taken by a de jure corporation which is beyond the powers granted in its corporate charter *(see, Jemison v Citizens' Sav. Bank,* 122 NY 135, 140). As such it is a substantive determination, unlike a determination of incapacity to sue which is procedural only *(see, Corporate Tax Delinquency,* 41 NYU L Rev 602, 612). Moreover, a delinquent corporation has forfeited its charter, and is prohibited from conducting any new business. To what

extent Business Corporation Law § 203 is impliedly applicable to de facto corporations under *Garzo v Maid of Mist Steamboat Co.* (303 NY 516, *supra)* need not concern us here, for as we have already stated, a delinquent corporation does not enjoy de facto status. *Expomotion, Ltd. v Heidepriem-Santandrea, Inc.* (101 Misc 2d 593, *supra),* resting upon this rationale, is expressly disapproved.

Finding each of Lorisa's arguments unpersuasive, we hold that it lacks capacity to use the courts of this State to enforce obligations arising out of the conduct of prohibited new business during the period of delinquency until it has secured retroactive de jure status by payment of delinquent franchise taxes.

In recognition that Lorisa may wish to avail itself of retroactive reinstatement, and in order to conserve judicial resources by eliminating the need to reinstitute this suit, should Lorisa wish to do so, the foreclosure action should be dismissed unless within 45 days after service upon it of the order to be made herein, with notice of entry, Lorisa has paid its preproclamation franchise taxes, penalties and interest, and has secured reinstatement. Should this period of time prove insufficient to complete the necessary procedures with the Tax Commission and Secretary of State, Lorisa may seek an extension from this court upon proof of payment.

Accordingly, the order appealed from should be reversed, those branches of the appellant's motion which sought to vacate the default judgment of foreclosure and sale dated February 24, 1984, and the order of possession dated September 18, 1984, should be granted, the branch of the appellant's motion which sought to dismiss the action should be deemed one under CPLR 3211 (a) (3) to dismiss upon the ground of the plaintiff's lack of capacity to sue, and should be granted unless within 45 days after service upon it of a copy of the order to be made hereon, with notice of entry, the plaintiff shall have secured reinstatement of its corporate status.

BROWN, LAWRENCE and KOOPER, JJ., concur.

Order of the Supreme Court, Kings County, entered January 14, 1985, reversed, on the law, with costs, those branches of the appellant's motion which sought to vacate a default judgment of foreclosure and sale of the same court, dated February 24, 1984, and an order of possession of the same court, dated September 18, 1984, granted, judgment and order vacated, and that branch of the appellant's motion which was

to dismiss the action as against him granted unless within 45 days after service upon it of a copy of the order to be made hereon, with notice of entry, the plaintiff shall have secured reinstatement of its corporate status.