OPINION OF THE COURT
Arthur F. Engoron, J.
*1110 It is hereby ordered that defendant’s motion is granted and plaintiffs motion is denied.
Brief Factual Background of Underlying Controversy
The instant case arises out of World War II, when Japanese soldiers tunneled under a certain area of Okinawa in defense of their homeland. Some 20 years later, in or about 1962, pursuant to Contract DA-328-ENG-619, the United States Army Corps of Engineers hired Peterson Sharpe Engineering Corporation (Peterson), of Nevada, to build junior and senior high schools in this same area. Peterson had a wholly-owned subsidiary named Construction Services Corporation, Ltd. (Construction), of Hong Kong, that acted as Peterson’s “purchasing agent.” In or about 1963, plaintiff Lance International, Inc. (Lance), of New York, agreed to sell certain building materials to Construction. According to plaintiff, defendant First National City Bank (now known as Citibank) acted as plaintiff’s “collection agent,” obligating itself to forward to plaintiff moneys due from Construction.
Unfortunately for all concerned, the tunnels proved to be a significant impediment to the construction. As progress slowed, so did payments from the government.
The Parties’ Basic Contentions
The gist of plaintiffs complaint is that it shipped the building materials; that Construction received them; that defendant received, or was able to receive, payments for the goods; but that defendant failed to transmit these payments to plaintiff. The gist of the defense is that plaintiff had agreed to extend a 90-day credit to Construction; that plaintiff agreed to accept the risk of nonpayment; that due to the construction delays, defendant never received full payment; and that defendant remitted to plaintiff whatever was due pursuant to the parties’ agreement and the custom and practice in the industry at the time. Abbreviated Procedural History
Plaintiff first sued defendant in Supreme Court, New York County, in or about 1966. In or about 1969, after some initial legal skirmishing, plaintiff served the instant complaint. In or about 1971, after further legal skirmishing, defendant served the instant answer. At some point in or about the early 1970s, plaintiff partially deposed an employee of defendant. In or about 1988, two status conferences were held and some disclosure was conducted. In or about 1994, the case was transferred, pursuant to CPLR 325 (d), to this court. In or about the mid-1990s, the *1111 parties litigated disclosure issues; defendant’s answer was conditionally stricken but never absolutely stricken. Although the foregoing is not a complete history, clearly the case has lain fallow for years on end.
In or about 2007, plaintiffs counsel filed a notice of trial. On or about July 21, 2008, defendant moved for summary judgment. Today’s decision renders the summary judgment motion, which is the subject of a separate, contemporaneous decision, moot.
Plaintiffs Corporate History
Plaintiff was incorporated in New York in or about 1959. From its inception to the present, or whenever it ceased to exist {infra), Albert M. Hochstadt has been its president, principal and driving force. In or about 1965, “Lance filed Chapter XI and basically ceased operations.” (Hochstadt deposition, May 18, 1989, at 38; Nelson moving affirmation, exhibit D.) Furthermore, “when Lance went into Chapter XI reorganization, it ceased its operations. It did not continue the business it did before and while it did various business activities from time to time, we never went back into the export business.” {Id. at 58.)
By Southern District of New York Bankruptcy Court order dated December 8, 1965 (cross-moving exhibit F), plaintiff was permitted to retain Robert D. Witte, Esq., “as special counsel” to prosecute the instant case, and his contingency fee was not to exceed 25% of any recovery.
In a proposed “Amended Plan of Arrangement,” dated March 21, 1967 (cross-moving exhibit C), Hochstadt stated as follows: “The debtor shall pay over, pro rata, to its general creditors [some 33 in number] . . . ten (10%) per cent of the net proceeds of any recovery, by judgment, settlement or otherwise, from [the instant action].” This proposal was accepted in a bankruptcy court order confirming amended arrangement dated September 17, 1967 {id.). However, as noted by plaintiff, “it is unclear if the creditors mentioned in the purported Order are still in existence.” (Brief for plaintiff-appellant, paper 4, at 6.)
According to the Department of State of the State of New York (Fishman moving exhibit C): “LANCE INTERNATIONAL, INC. . . . was dissolved by proclamation of the Secretary of State published on 12/15/1975, pursuant to the Tax Law, and . . . such dissolution has not been annulled.”
*1112 Plaintiffs Attempts to Assign the Instant Claim
In or about the mid-1990s, plaintiff commenced serial efforts to transfer the instant claim, or the prosecution thereof, to Hochstadt. At some point the following undated purported assignment (record on appeal at 14), signed by Hochstadt, came into existence:
“ASSIGNMENT
“For and in consideration of the sum of ten ($10.00) dollars, the receipt of which is acknowledged, and other good and valuable considerations, Lance International, Inc., hereby sells, assigns and transfers to A.M. Hochstadt as trustee of the shareholders of Lance International, Inc. (consisting of A.M. Hochstadt, Carrie Hochstadt and Todd Hochstadt) all right, title and interest, in and to, all claims, causes of action and monies due to Lance International, Inc., from First National City Bank, the details of which claims are contained in [the instant action].
“Lance International, Inc.
“By/s/
“President”
In or about 1997, plaintiff moved, pursuant to CPLR 1018, to substitute Hochstadt as plaintiff. In support of the motion, Hochstadt stated that “[a]t all times during the course of this litigation I was, and remain, the real party in interest.” (Record on appeal at 13.) His counsel concurred, adding that “Mr. Hochstadt . . . has paid the bills and controlled the litigation since its inception.” (Record on appeal at 43.) Defendant opposed the motion “because it did not believe Mr. Hochstadt would effectively serve the interests of Lance and any potential creditors.” (Nelson reply affirmation ¶ 5.) In a decision dated October 14, 1997 (record at 5), Civil Court Judge Carol Arber ruled as follows:
“Defendant objects to the substitution on several grounds. First, defendant states there is no evidence of the existence of a trust for which Hochstadt acts as trustee. Secondly, the assignment is undated and is signed by Hochstadt as president of Lance and lacks any evidence that the assignment has been duly authorized by the corporation or is based on valid consideration. Additionally, defendant contends that the purported assignment may constitute an attempted fraudulent conveyance since it is incon *1113 sistent with the March 27, 1967 order approving plaintiffs amended bankruptcy plan. [T]he bankruptcy order provides that plaintiffs creditors were to receive 10% of the net proceeds of any recovery obtained by plaintiff.
“Finally, defendant argues that Hochstadf s substitution is an attempt to achieve the pro se appearance of Hochstadt by circumventing the Court’s denial of such pro se appearance on two prior occasions ....
“The Court agrees with objections [sic] raised by defendant and finds that plaintiff has failed to establish entitlement to the substitution. Accordingly, the motion for substitution is denied in all respects.”
Plaintiff appealed this decision. Although neither side has a copy of any appellate decision, both sides agree that Judge Arber’s decision was not reversed (and, thus, is “law of the case”).
The Instant Motion
The instant motion is denominated as one for summary judgment, pursuant to CPLR 3212. As argued by plaintiff, the time to make such a motion has long since passed, and this court never gave permission for defendant to make a belated one, or to amend the one already under submission. The court also never gave defendant permission to make a new substantive argument (its third “point,” which defendant has since withdrawn).
In any event, pursuant to CPLR 2001, the instant motion will be addressed as a motion to dismiss, pursuant to CPLR 3211 (a) (3), for lack of capacity to sue. It could also be considered as a motion to dismiss pursuant to CPLR 3211 (a) (1) (defense founded upon documentary evidence, i.e., the dissolution proclamation); CPLR 3211 (a) (2) (no subject matter jurisdiction, as there is no plaintiff, and thus no case or controversy); CPLR 1017, 1021; and/or Business Corporation Law §§ 1005, 1006.
Statutory Framework
The Business Corporation Law directly addresses the issue of the status of dissolved corporations. Business Corporation Law § 1005 provides, as here relevant, as follows:
“(a) After dissolution:
“(1) The corporation shall carry on no business except for the purpose of winding up its affairs.
“(2) The corporation shall proceed to wind up its af *1114 fairs, with power to fulfill or discharge its contracts, collect its assets, sell its assets . . . , discharge or pay its liabilities, and do all other acts appropriate to liquidate its business.”
Business Corporation Law § 1006 provides, as here relevant, as follows:
“(a) A dissolved corporation, its directors, officers and shareholders may continue to function for the purpose of winding up the affairs of the corporation in the same manner as if the dissolution had not taken place, except as otherwise provided in this chapter or by court order. In particular, and without limiting the generality of the foregoing: . . .
“(4) The corporation may sue or be sued in all courts and participate in actions and proceedings, whether judicial, [etc.], in its corporate name . . .
“(b) The dissolution of a corporation shall not affect any remedy available to or against such corporation, its directors, officers or shareholders for any right or claim existing . . . before such dissolution . . . .”
CPLR 1017 provides that “[i]f ... a corporate party is dissolved, the court shall order substitution of the proper part[y].” CPLR 1021 provides, “[i]f the event requiring substitution occurs before final judgment and substitution is not made within a reasonable time, the action may be dismissed as to the party for whom substitution should have been made, however, such dismissal shall not be on the merits unless the court shall so indicate.” However, Vincent C. Alexander, in his Practice Commentaries, cites Business Corporation Law §§ 1006 and 1117 for the proposition that CPLR 1017 can be disregarded and substitution avoided in the case of corporate dissolution. He reasons that the “specific provisions” of the Business Corporation Law override the more general provisions of the CPLR. (Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR 1017, at 219 [1997 ed].) This court will accept this reasoning for present purposes, and today’s decision is not based on a failure to substitute.
Interpretive Cases
In the leading case of Lorisa Capital Corp. v Gallo (119 AD2d 99, 109-110 [2d Dept 1986]), which found that a dissolved corporation lacked capacity to sue based on a postdissolution transaction, the Court stated as follows:
“Upon dissolution, a corporation’s legal existence terminates (Lattin, Corporations § 183, at 642 [2d *1115 ed]). This rule is qualified by statute to provide that a corporation retains a limited de jure existence for the purpose of winding up (Business Corporation Law § 1005 [a] [1]; § 1006). . .
“Statutory dissolution by proclamation of the Secretary of State pursuant to Tax Law § 203-a is intended to encourage voluntary payment of franchise taxes (see, Bowditch v. 57 Laight St. Corp., 111 Misc 2d 255). After dissolution, a delinquent corporation retains a limited de jure existence solely for the purpose of winding up its affairs, and retains capacity to bring suit for that purpose (see, Tax Law § 203-a [10]; Business Corporation Law §§ 1009, 1006). . . . It is apparent from the statutory scheme that the Legislature did not intend a delinquent corporation which has not sought reinstatement to enjoy the privileges of corporate existence, which include the right to acquire a mortgage interest and the right to bring suit in the courts of this State . . . .”
Lorisa is not directly on point because here, plaintiff sued predissolution based on predissolution transactions. However, the reasoning of Lorisa, that courts must foster compliance with the Tax Law, and that a dissolved corporation may only “wind up” its affairs, must be brought to bear.
In Haslacha, Inc. v Jubilee, Inc. (7 Misc 3d 1016[A], 2005 NY Slip Op 50633[U] [Civ Ct, NY County 2005]), upon which plaintiff relies, Judge Eileen Nadelson, citing the aforesaid authorities (and others), denied a motion to dismiss that was based on the fact that the petitioner was dissolved, for tax delinquency, between the close of evidence and the making of closing statements in the case. This is a rather far cry from a corporation being dissolved at least 34 years before getting to trial. In Independent Inv. Protective League v Time, Inc. (50 NY2d 259 [1980, Cooke, Ch. J.]), also relied upon by plaintiff, the Court ruled that a corporation’s dissolution did not preclude a shareholder at the time of dissolution from filing a derivative claim on the corporation’s behalf. This case is unavailing to plaintiff for two independent reasons. First, the suit was commenced six months after the dissolution, and there is no discussion of any inordinate delay in its prosecution. Second, and more importantly, the nature of a derivative suit is a claim by a shareholder(s) that the corporation has not acted in the shareholders’ interests vis-á-vis a third party (the defendant). *1116 Thus, the real parties in interest, the shareholders, have not been dissolved at all. Obviously, corporations should be not allowed to dissolve for the purpose of fleecing their shareholders.
Discussion
The governing law is simple but vague: “After dissolution, a delinquent corporation retains a limited de jure existence solely for the purpose of winding up its affairs.” (Lorisa, 119 AD2d at 110.) But how long is “limited”? And what constitutes “winding up”? There are no quantitative answers, or even guidelines.
This court has pondered these questions since first reading Lorisa several years ago, in connection with another “dissolution” case. Rather than a “one-size-fits-all” answer, this court has always considered useful the image of an old-fashioned dry goods store. One day its corporate charter is dissolved for nonpayment of taxes, having nothing to do with the business itself (except, perhaps, a lack thereof). Why not let the store finish selling its inventory (the proverbial “going out of business sale”)? And what about the store’s vendors who sold goods on credit, and the store’s customers who purchased goods on credit? For the greater good of society, as well as fairness in each particular instance, and to hew to the dictates of capitalism, the former should get paid, and the latter should pay. And if this takes the institution, or continuation, of litigation, then so be it.
Central to the foregoing image are two qualities not present here. First, by suing and being sued, the business would be resolving both sides of the ledger; it would not just be waiting for a pot of gold at the end of the rainbow. Second, all suits would proceed to quick resolutions, by settlement or trial. A year or two or three comes to mind.* Otherwise, a dissolved corporate plaintiff becomes a mere puppet, whose strings are pulled by lawyers looking for fees and/or by former principals, who stand to gain but not to lose. Fitfully pursuing a problematic lawsuit for 44/2 decades after the events in issue transpired and after the business declares bankruptcy, and 3V2 decades after the corporation is dissolved, just does not sound like a limited *1117 winding up of affairs. To paraphrase Gertrude Stein regarding Oakland, four decades after bankruptcy, and three decades after dissolution, “there is no longer any there there.” Hochstadt has said as much for years now.
Another ground for today’s decision is “live by the sword; die by the sword.” By incorporating Lance, Hochstadt received at least one significant benefit, to wit, a shield against personal liability. That came in rather handy when Lance went bankrupt owing money to at least 33 general creditors. But to maintain its corporate status, Lance was required to pay a franchise tax, which it ceased doing some 33 years ago. Either you are a corporation or you are not. If you have no de jure existence and no de facto existence, you cannot exist solely as the tip jar on your former principal’s piano. If plaintiff were allowed to proceed and eventually prevailed in this litigation, who would receive any recovery? To whom would a check be made out? Who would file a satisfaction of judgment? Not Lance; Lance no longer exists.
In the final analysis, a corporation that declares bankruptcy, ceases to operate, stops paying taxes, and dissolves, and that does not exist even on paper for more than three decades, is not “winding up its affairs.” Its affairs have already been wound up.
Conclusion
Thus, the instant motion is granted. The instant cross motion is denied, despite being meritorious to the extent that it claimed that defendant’s motion included an unauthorized argument. The denial is in the court’s discretion, with all things considered, particularly defendant’s considerable defense costs over more than four decades, and the fact that defendant officially withdrew the extraneous material.
Based on the foregoing, the clerk is directed to enter judgment dismissing the instant action.

 On March 23, 2009, the partners of Wolf Block, a century-old Philadelphia-based law firm with 300 attorneys, voted to begin an “orderly unwinding of the firm’s business.” “Wolf Block will remain in the practice of law for several months to protect the interests of its clients, employees and creditors.” (Gina Passarella, Wolf Block Partners Vote to Close Doors, NYLJ, Mar. 24, 2009, at 1, col 1.) If a century-old law firm with 400 or 500 employees can wind up its affairs in “several months,” surely plaintiff, a small, closely-held corporation operating for about six years (1959-1965), could have wound up its affairs in less time than three decades.