172 East 122 Street Tenants Association et al., Respondents, v Frederick A. O. Schwarz, Jr., as Corporation Counsel of the City of New York, et al., Appellants.

First Department, April 19, 1988

### APPEARANCES OF COUNSEL

*Georgette R. Chapman* of counsel *(Gloria Quinones* with her on the brief; *David W. Weschler,* attorney), for respondents.

*Pamela Seider Dolgow* of counsel *(Leonard Koerner* with her on the brief; *Peter L. Zimroth,* attorney), for Frederick A. O. Schwarz, Jr., as Corporation Counsel, appellant.

*Herbert Kahn* for P.R.F. Realty, appellant.

*Stuart M. Fischman* of counsel *(Bruce N. Roberts* with him on the brief; *Salon, Marrow & Dyckman,* attorneys), for 420-172 East Associates, appellant.

### OPINION OF THE COURT

ELLERIN, J.

This action involves a situation remarkably similar, both factually and legally, to that present in *Matter of Lewis v Schwartz* (119 AD2d 116), decided by this court on August 21, 1986, which held that a dissolved corporation is ineligible to apply for release of its formerly owned property under Administrative Code of the City of New York § D17-25.0 (f) (now renum § 11-424 [f]).

The properties here involved, 172 E. 122 St. and 174 E. 122 St. (the buildings), are adjoining multiple dwellings in East Harlem each containing 10 residential units. In October 1981, appellant P.R.F. Realty Corp., the then owner, abandoned the buildings, and on June 9, 1982, the Commissioner of Finance for the City of New York filed an in rem tax foreclosure action against these properties (index No. 460001/82). The City of New York eventually foreclosed on July 31, 1985, acquiring title to the buildings when P.R.F., the last owner-of-record, defaulted in the "In Rem" action. In the interim, P.R.F. had been dissolved by the Secretary of State on December 29, 1982 because it had failed to pay its corporate franchise taxes for at least two years preceding that date.

After the foreclosure in 1985, P.R.F. filed an application for release of the city's interest in the buildings pursuant to Administrative Code § D17-25.0. The Corporation Counsel on

March 5, 1986 conditionally approved the application pending the payment of $85,058.01 in various delinquent tax deficiencies by April 4, 1986. On April 2, 1986, while title was still vested in the city, P.R.F. executed a deed purporting to convey the buildings to 420-172 East Associates (East Associates). On April 4, 1986, East Associates paid the release price to the city on behalf of P.R.F. and the buildings were shortly thereafter released to P.R.F.

Just as in *Matter of Lewis v Schwartz (supra)*, while the foregoing history was unfolding, other significant developments were transpiring which affected the residents of the buildings. By October of 1981, P.R.F. had stopped collecting rents and it supplied no heat or hot water to the tenants during the entire winter of 1981-1982. As a consequence, in January 1982 the tenants of 172 E. 122 Street organized a tenants' association and pooled their resources to purchase fuel and restore utility services. Eventually, one of the tenants became a court-appointed 7-A Administrator (RPAPL 778) to collect rents and manage the building, and through the Administrator, the tenants have made significant improvements to the building. At 174 E. 122 Street, the former tenants were forced to leave the building during the winter of 1981-1982 when the pipes froze and caused further extensive structural damage. The present tenants first occupied the building in May 1982 and made substantial improvements to the building at their own expense. By 1985, the "Vesting Unit" of the Department of Housing Preservation and Development of the City of New York (HPD) formally assumed management of 174 E. 122 St., recognized the residents of the building as legitimate tenants, and gave them leases to their apartments.

After foreclosure by the city, the tenants of both buildings filed applications with HPD for the Tenant Interim Lease Program, a plan enacted by the City of New York to promote and assist the purchase and management by the tenants of deteriorated and abandoned buildings acquired by the city in "In Rem" proceedings. *(See*, Board of Estimate Resolution, cal No. 178, Mar. 22, 1979.) Before the city acted on those applications, the city released the buildings to P.R.F. as previously described.

Within days after the actual release of the properties, the tenants associations of the buildings commenced this CPLR article 78 proceeding to vacate the city's release of the buildings and to void the transfer from P.R.F. to East Associates. In a comprehensive and thorough opinion, which we adopt, the

IAS Justice granted the petition, relying on our then unanimous decision in *Matter of Lewis v Schwartz (supra).*

Consideration and analysis of the issues presented by this case, emphasize the validity of the conclusion reached in *Matter of Lewis v Schwartz (supra)* and compel its reaffirmance.

Administrative Code § 11-424 (f) (formerly numbered § D17-25.0 [f]) provides that an application to release property acquired by the city in rem made within four months after the date of the city's acquisition "shall be granted providing the corporation counsel approves the application as to form, timeliness and *eligibility of the applicant* and providing *the applicant has paid* all amounts required to be paid by subdivision d of this section within thirty days of the date on which a letter *requesting applicant to make such* payment is mailed or delivered to the applicant". (Emphasis added.)

As was discussed in *Matter of Lewis v Schwartz (supra),* a corporation which is dissolved because of delinquency in paying franchise taxes is not eligible to apply for release of the property because such action would be violative of the proscription in Business Corporation Law § 1005 (a) (1) that a dissolved corporation "shall carry on no business except for the purpose of winding up its affairs". The permissible activities which constitute the "winding up" of a dissolved corporation's affairs are described with precision in subdivision (a) (2) of the section as follows: "power to fulfill or discharge its contracts, collect its assets, sell its assets for cash at public or private sale, discharge or pay its liabilities, and do all other acts appropriate to liquidate its business."

The dissent itself recognizes that, as a dissolved corporation, the eligibility of P.R.F. to apply under the Administrative Code for release of the property can be sustained *only if* such activity can be construed as falling within the permissible ambit of collecting the corporation's assets incidental to winding up its affairs. The dissent's conclusion that the application here was precisely such an activity is predicated upon the untenable premise that because P.R.F. owned the property at the time of the city's acquisition thereof, the property continued to remain an asset of the dissolved corporation. This interesting thesis is at variance both with the language of the Administrative Code section itself, and with the legal consequences stemming from the city's foreclosure on the property.

Once the in rem foreclosure proceedings were concluded, the

city received a judgment awarding it an estate in fee simple absolute in the property and all rights therein of the prior owner were "wiped out", including any equitable rights or interests such as a right of redemption. *(See, Old Dutch Lands v City of New York,* 55 Misc 2d 384, 386, *mod on other grounds* 32 AD2d 649, *affd* 26 NY2d 984; *Matter of Lewis v Schwartz, supra,* at 123; Administrative Code § 11-412 [formerly numbered § D17-12.0].) The release provision here at issue (Administrative Code § 11-424 [f]) merely provides for a grace period for release by the city to persons unfairly deprived of their property but does not perpetuate or revive property interests that have already been terminated. *(Matter of Lewis v Schwartz, supra,* at 123; *Old Dutch Lands v City of New York, supra.)* Once title passed to the city on July 31, 1985 "the property ceased to be a corporate asset" *(Matter of Lewis v Schwartz, supra,* at 123) and the activities undertaken by P.R.F. thereafter cannot be "sanitized" by cloaking them in the statutory terminology of collecting "its principal asset * * * to sell it" when, in fact, it had no such asset.

Nor can it seriously be argued that this dissolved corporation's attempt to regain the ownership of the subject property, almost five years after it had consciously and intentionally abandoned it, constituted the "winding up of its affairs". After it deserted the property, P.R.F. eschewed all contact with the buildings and affirmatively left them to deteriorate while at the same time defaulting on its tax obligations not only incidental to that property but also with respect to the franchise taxes critical to its corporate existence. In that posture, where its only prior "asset" had been lost through its own affirmative acts, and where it had been a dormant dissolved corporation for so long, P.R.F. can hardly be said to have had "affairs" to "wind up".

While the dissent manifests concern with the rights of the "purchaser" East Associates because it bought the properties "in reliance upon the City's approval of the application for their release", that concern appears misplaced and completely ignores the character of the agreement between East and P.R.F. on April 2, 1985 and the fact that it was one which P.R.F. had no right to enter into. It cannot be disputed that on April 2, 1985, P.R.F. had no title to the subject property and that the property was still wholly owned by the city. It is clear, therefore, that any agreement between East and P.R.F. on that date, no matter how characterized by the parties or the dissent, cannot be construed as one for the sale of an

actually existing corporate asset, of the type contemplated and permitted by General Business Law § 1005 (a) (2), as part of the dissolved corporation's winding up of its affairs. By its own terms, that transaction was not designed to "wind up" P.R.F.'s affairs as they stood as of the date of the agreement but was, rather, precisely the kind of conduct proscribed by section 1005 (a) (1) in that it constituted the active carrying on of new business by P.R.F. in entering into an arrangement whereby East, fully aware of P.R.F.'s dissolved status, would provide the money that would enable P.R.F. to "buy back" property which it had formerly owned and thereafter transfer it to East. To allow a dissolved corporation, that has been in default for many years in the payment of its corporate franchise taxes, to engage in such self-serving new business activity would be to completely ignore and frustrate the purposes behind the legislative strictures placed upon the activities of such corporations and to, in effect, penalize those corporations who do faithfully meet their franchise tax obligations. *(See, Lorisa Capital Corp. v Gallo,* 119 AD2d 99, 109-110.)

Moreover, the record reflects that East Associates was fully cognizant of all the relevant facts and circumstances surrounding the transaction in question, including the infirmities stemming from P.R.F.'s status as a dissolved corporation. This is emphasized by East's own undertaking to directly pay the outstanding tax obligations notwithstanding that subdivision (f) expressly conditions the granting of the application on "eligibility of the applicant and providing the *applicant has paid all amounts* required to be paid" (emphasis added). This express direction in the statute as to the party by whom payment is to be made cannot be held to be without significance particularly when read within the framework of an application by a former owner who is a dissolved corporation.

Despite intimations of some possible factual distinctions between the instant case and the situation in *Matter of Lewis v Schwartz* (119 AD2d 116), the dissent itself recognizes that any such differences are essentially irrelevant and that the critical, and dispositive, factor is whether or not P.R.F., as a dissolved corporation, was eligible to apply for release of the property under the Administrative Code provision in question. Having concluded that it was, albeit on an insupportable basis, the dissent is left in the uncomfortable position of having to acknowledge that this leads to the untenable and inherently inequitable result of permitting a "delinquent taxpayer" who "has also been a neglectful landlord" to prevail

and benefit over the interests of "tenants who have suffered in their daily lives because of that neglect". In the instant case, the abandonment and neglect of the subject buildings by P.R.F. did indeed cause severe hardships to the residents of those buildings and resulted in the tenants thereafter expending considerable amounts of their own money and energy to effect substantial improvements in the property. Those efforts were formally sanctioned by the courts through the appointment of a 7-A Administrator and the tenants were further actively encouraged in their endeavors by the city through its Tenant Interim Leasing Program, with the eventual objective of the tenants purchasing the building from the city consistent with the policy goals set forth in the Board of Estimate resolution establishing that program. Notwithstanding its active involvement in administering the Tenant Interim Leasing Program in connection with these very buildings and its knowledge of the derelictions and abandonment by the former owner, the city nevertheless released the property to the neglectful former owner and urges us to uphold its "rewarding" of this dissolved corporation whose delinquencies also extended to its city and State tax obligations.

The dissent, which adopts the city's position, asserts that the city was "mandated" to release the property in question under the relevant Administrative Code provision and that relief from any inequity or injustice which may ensue thereby requires legislative recourse. No such recourse is necessary and the indefensible result urged by the city is not a consequence of legislative oversight or poor drafting. That result stems solely from the city's own untoward and inappropriate interpretation of the release provisions in issue.

The city, and the dissent, repeatedly refer to the "mandatory" nature of subdivision (f) as a justification for releasing the property. However, that subdivision is "mandatory" only to the extent that property "shall be" released where an application is made within four months from the date of foreclosure *providing* that the Corporation Counsel approves the application as to form, timeliness and *eligibility,* of the applicant. The inclusion of this proviso is the key. There are, of course, cases such as the instant one, involving a dissolved corporation, where the applicant's lack of eligibility is legally mandated by virtue of other applicable statutory strictures and the city, through the Corporation Counsel, is required to give effect to such disqualification and deny the application by reason thereof. It would appear, however, that even in cases

where no such legal disability exists, the inclusion in the statute of a proviso which expressly authorizes the city to pass upon the "eligibility" of an applicant seeking release of foreclosed property is obviously intended to provide a mechanism by which the city is not only able to effectuate the purpose for which the statute was enacted—that is, to protect property owners who may have been unfairly deprived of their property—but which at the same time reserves to the city the ability, in an appropriate case, to prevent an inequitable result by finding a former owner ineligible to apply for the release of property where that former owner's improper conduct with respect to the property has egregiously injured or impinged upon the rights of others.

In the instant case, P.R.F. having been ineligible *ab initio,* by virtue of its status as a dissolved corporation, to apply for release of its formerly owned property, the city's approval of P.R.F.'s application and the subsequent release to it of the property were improper, as was the transfer of that property from P.R.F. to East Associates.

Accordingly, the order and judgment (one paper), Supreme Court, New York County (Helen Freedman, J.), entered February 18, 1987 which, *inter alia,* granted the article 78 petition to the extent of declaring the transfer of the subject buildings from P.R.F. Realty Corp. to 470-172 East Associates void; vacating the Corporation Counsel's approval of the application of P.R.F. Realty Corp. to release the buildings; and revesting title to the buildings in the City of New York should be affirmed, without costs.

SANDLER, J. (dissenting). Respondents-appellants—Corporation Counsel of the City of New York, P.R.F. Realty Corp., and 420-172 East Associates—appeal from an order and judgment of the Supreme Court which granted the petition in a CPLR article 78 proceeding brought by tenant associations in two adjoining buildings, to the extent of (1) vacating the Corporation Counsel's approval of P.R.F. Realty Corp.'s application seeking release of the city's interest in the property; (2) voiding the transfer of the buildings from P.R.F. Realty Corp. to 420-172 East Associates; and (3) revesting title to the buildings to the City of New York.

As the I.A.S. Judge appropriately concluded, the central issue in this case is the same as that which the court addressed in *Matter of Lewis v Schwartz* (119 AD2d 116). Although circumstances are presented here that might arguably

support, consistent with the rule set forth in *Matter of Lewis v Schwartz,* a result contrary to that reached by the I.A.S. court, I agree that the court had a substantial basis for considering the *Lewis* decision to be dispositive.

The issue is whether or not a dissolved corporation which owned property foreclosed for delinquent taxes qualifies as a "party who had an interest in [property acquired by in rem tax foreclosure] as * * * owner * * * at the time of the city's acquisition thereof" pursuant to section D17-25.0 (a) of the Administrative Code of the City of New York such that it is eligible to seek release of the foreclosed property.

In *Matter of Lewis v Schwartz (supra),* this court held, in a decision to which I then subscribed as a member of the panel, that a corporation dissolved because of failure to pay franchise taxes, was ineligible to seek release of foreclosed property. In the light of the appellate presentation in this case, and on the basis of further consideration, I am now persuaded that this conclusion was erroneous, and that the rule set forth in *Matter of Lewis v Schwartz* should be overruled.

Business Corporation Law § 1005, the statutory section regulating the powers of a dissolved corporation, provides in pertinent part as follows:

"(1) The corporation shall carry on no business except for the purpose of winding up its affairs.

"(2) The corporation shall proceed to wind up its affairs, with power to fulfill or discharge its contracts, collect its assets, sell its assets for cash at public or private sale, discharge or pay its liabilities, and do all other acts appropriate to liquidate its business." (Business Corporation Law § 1005 [a] [1], [2].)

The critical language in the above-quoted section is that part of subdivision (a) (2) which authorizes a corporation to "collect its assets". In the light of this explicit statutory language, the rule set forth in *Matter of Lewis v Schwartz (supra)* necessarily depends on a determination that property owned at the time of the city's acquisition as to which the owner is eligible to seek release is not an asset. With all due respect, this proposition seems to me untenable.

Manifestly, the property as to which the owner at the time of foreclosure has the right to seek release is an asset, as the facts of this case clearly illustrate. Particularly is this clear where, as here, the application for release is made within four months after the date of the city's acquisition of the property.

In that circumstance, section D17-25.0 (f) of the Administrative Code explicitly provides that the application "shall be granted" subject to compliance with certain procedural requirements.

The record is clear that P.R.F. Realty Corp., owner of the foreclosed properties, made an application, complying with all procedural requirements, for release to it of the foreclosed property at a time when it became the mandatory obligation of the city to grant the application, which the city did, in compliance with the applicable law. The application was made for the purpose of enabling the applicant to sell the property to 420-172 East Associates for a sum that was to be applied, and was applied, to the discharge of all outstanding tax liabilities. In short, P.R.F. Realty Corp., in scrupulous compliance with the provisions of section 1005 of the Business Corporation Law, collected its principal asset and did so to sell it, with a view to discharging its principal liability in connection with the liquidation of its business. It is difficult to envisage a course of conduct more consistent with the directions set forth in the controlling statute.

In reviewing this court's opinion in *Matter of Lewis v Schwartz (supra)*, it seems to me reasonable to infer that the underlying issue was obscured by extraneous facts, including doubts as to the bona fides of the sale of the property, which gave rise to complicated but irrelevant legal arguments. In addition, there were circumstances which collectively indicated that sustaining the release of the property would cause a severe injustice to tenants who, after their landlord's neglect of his obligations, had made substantial improvements to the building, had applied for admission to the city's Tenant Interim Leasing Program with the objective of purchasing the building, and which, as the court's opinion noted (at 117): "The record shows that the tenant's application would have been approved but for the city's decision here at issue to return the building".

As I have already suggested, distinguishing factors are presented here which might at least arguably support the result here urged on grounds consistent with the rule set forth in *Matter of Lewis v Schwartz*. In particular, it appears that in this case, unlike *Lewis*, the purchaser bought the properties and thereby discharged the tax liabilities in reliance upon the city's approval of the application for their release, and prior to any challenge to the validity of that action having been undertaken by the petitioners. Pertinently, the record is clear

that petitioners were aware of the city's approval of the application some months before the purchase of the property and undertook no challenge to that action during the intervening period. Moreover, it seems to me at least doubtful under the circumstances presented that the petitioners had standing to commence this article 78 proceeding. Although the tenants associations with which we are here concerned had applied for admission to the city's Tenant Interim Leasing Program, there is no suggestion in this record, contrary to the situation in *Matter of Lewis v Schwartz* (119 AD2d 116, *supra)* that the application would have been approved except for the release of the foreclosed property.

In view of my conclusion that P.R.F. Realty Corp., though dissolved for failure to pay franchise taxes, was eligible to seek release of the property it had owned at the time of the city's acquisition, and that the city's approval of the application was mandated by law, I think it unnecessary to decide these and other issues that might distinguish this case from *Matter of Lewis v Schwartz (supra).*

The underlying facts of this case, as well as those presented in *Matter of Lewis v Schwartz,* make appropriate a comment on an issue of public policy that appears to merit legislative consideration. When one examines the provisions of Administrative Code § D17-25.0 relating to applications to the city for release of property acquired by in rem tax foreclosure, it is apparent that the several provisions represent primarily an effort to facilitate the city's collection of tax arrears. There appears no consideration in these provisions of the special situation presented where a delinquent taxpayer has also been a neglectful landlord, and in which tenants who have suffered in their daily lives because of that neglect have organized themselves in an effort to improve their living conditions and have undertaken to participate in a program which in particular situations permits their purchase of the buildings in which they live.

Appreciating the limits of information available to an appellate Judge confined to a particular record, it would seem that there are values to be served in such a situation that are not reflected in the provisions of the governing statute. In particular, the question could be raised as to whether or not some such combination of circumstances might not justify a limited exception to that subdivision which mandates acceptance of an application to release foreclosed property if made within a four-month period. It may, of course, be that there are practi-

cal considerations that would make such an exception counterproductive on a more balanced view of the matter than is available to an appellate Judge. The possibility of some such change would seem to merit legislative consideration.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Helen E. Freedman, J.), entered February 18, 1987, which, in an article 78 proceeding, granted the petition to the extent of (1) vacating the Corporation Counsel's approval of P.R.F. Realty Corp.'s application seeking release of the city's interest in the property; (2) voiding the transfer of the building to 420-172 East Associates; and (3) revesting title to the building to the City of New York should be reversed, and the petition should be dismissed.

MURPHY, P. J., and SMITH, J., concur with ELLERIN, J.; SANDLER and SULLIVAN, JJ., dissent in an opinion by SANDLER, J.

Order and judgment (one paper), Supreme Court, New York County, entered on February 18, 1987, affirmed, without costs and without disbursements.