**AGV PRODUCTIONS, INC., Plaintiff,**

v.

**METRO–GOLDWYN–MAYER, INC. and ORION PICTURES COR-PORATION, Defendants.**

**No. 99 CIV. 9852(AGS).**

United States District Court, S.D. New York.

Sept. 15, 2000.

Robert S. Churchill, Gerstein & Churchill, New York City, Norman S. Oberstein, Oberstein, Kibre & Horwitz, Los Angeles, CA, for plaintiff.

Francis J. Menton, Jr., Wilkie Farr & Gallagher, New York City, for defendant.

## OPINION AND ORDER

SCHWARTZ, District Judge.

In this action, plaintiff seeks a declaratory judgment that defendant Metro–Goldwyn–Mayer, Inc. is not the owner of certain sequel rights in the motion picture entitled "Terminator". Currently before the Court are plaintiff's motion for summary judgment and defendants' cross-motion for partial summary judgment and dismissal of the complaint. For the reasons stated below, plaintiff's motion is denied and defendants' motion is granted.

## I. Factual Background

### A. The Parties and the Property

Plaintiff AGV Productions, Inc. ("plaintiff") is a corporation organized and existing under the laws of California, with its principal place of business located in Santa Monica, California. (Amended Complaint ("Compl.") ¶ 1.) Defendant Orion Pictures Corporation ("Orion") is a corporation organized and existing under the laws of Delaware, with its principal place of business located in Santa Monica, California. (*Id.* ¶ 3.) Defendant Metro–Goldwyn–Mayer, Inc. ("MGM"), a corporation organized and existing under the laws of Delaware with its principal place of business located in Santa Monica, California, is the parent company of Orion, and its successor-in-interest. (Answer to Compl. ¶ 2; Declaration of Tim Campbell in Support of Defendants' Cross–Motion for Partial Summary Judgment and Dismissal of the Complaint and in Opposition to Plaintiff's Motion for Summary Judgment ("Campbell Decl.") ¶ 12.)

This case concerns certain rights to the motion picture called "Terminator", an action/thriller which enjoyed commercial success in the 1980s and 1990s. *See* Bernard Weintraub, "A Woman Making Movies for Men," *N.Y. Times,* May 3, 1994, *available in* LEXIS, News Library, Allnws File. The original "Terminator" was released by Orion in 1984 and its sequel, "Terminator 2: Judgment Day," was released by Carolco Pictures, Inc. ("Carolco Pictures") in 1991. *See* Weintraub, *supra;* (Campbell Decl. ¶ 6.) The property at issue in this proceeding relates to certain sequel, remake, television, and ancillary rights (hereinafter "sequel rights") to future motion pictures in the series.[1] Specifically,

1. The parties' submissions reflect an ambiguity in the specific rights that are encompassed by the right of first negotiation. Plaintiff represents that the scope is rather narrow, encompassing only the right to market and distribute sequels. (Letter from Robert S. Churchill to the Court dated Aug. 31, 2000 at 2; Tr. at 10:3–4.) Defendants at once represent that the scope is broad, encompassing

MGM claims that it has a "right of first negotiation" for sequel distribution rights, while plaintiff claims that such rights are invalid as a matter of federal and state law. The history of this dispute involves the operation of a series of distribution and licensing agreements involving Orion and negotiated in the mid–1980s, and the effect on those agreements of Orion's Chapter 11 bankruptcy proceedings in the early 1990s. These agreements and the specifics of the bankruptcy proceedings are outlined below.

## B. The Hemdale–Orion Agreements

In 1982, Hemdale Leisure Corporation ("Hemdale")[2] acquired the rights in "Terminator" from Pacific Western Productions, Inc. ("PWP"), which retained a one-half interest in the sequel and remake rights. (Declarations of Andrew J. Vajna and Brian L. Davidoff dated Nov. 18, 1999, Ex. 1 ("AGV Ex. 1").)[3] In February 1983, Hemdale transferred the domestic and foreign distribution rights in "Terminator" to Orion via two agreements (collectively the "Hemdale–Orion Agreements"), one governing the United States and Canada (the "Domestic Distribution Agreement") and the other governing the rest of the world (the "Foreign Distribution Agreement").

Pursuant to the Domestic Distribution Agreement, entered into by the parties on February 3, 1983, Orion acquired, *inter alia*, the right to (i) rent, lease, distribute, reissue, and otherwise deal in and with respect to the Picture, (ii) project and exhibit the film, (iii) make foreign language versions, (iv) contract with sub-distribu-

tors, and to (v) publicize and advertise the picture. (Domestic Distribution Agreement ¶¶ 7.01, 7.05, 7.11.) Each party could assign its rights. (*Id.* ¶ 8.06) Further, Orion was required to pay to Hemdale a certain percentage of its profits and revenues, and to submit to Hemdale periodic reports showing collections for designated accounting periods. (*Id.* ¶¶ 5.01–5.02; Ex. A.) The Foreign Distribution Agreement, entered into by the parties on February 18, 1983, set forth the same rights and obligations as under the Domestic Distribution Agreement, except that these rights applied to territories outside of the United States and Canada and their respective territories and possessions. (Foreign Distribution Agreement ¶¶ 5.01–5.02, 7.01, 7.06, 7.12, 8.06, Ex. A.)

A "right of first negotiation" for sequel and remake rights was included as a separate clause in both agreements. That clause reads as follows:

> With respect to the [sequel and remake] rights set forth in this [paragraph], Orion shall have and is hereby granted a right of first negotiation as follows. If Orion or [Hemdale] desires to exercise such rights, the parties agree to negotiate in good faith with respect thereto. If the parties cannot agree upon the terms relating to such exercise after thirty (30) days of such negotiation, [Hemdale] shall then be free to negotiate with other parties, provided that [Hemdale] shall not accept an offer which is equal or less favorable than that offered by Orion. (Domestic Distri-

rights to produce and exploit generally, and more narrow, encompassing solely distribution rights. (Letter from Francis J. Menton, Jr. to Howard Weg dated Oct. 10, 1997 (broad); Defendants MGM's and Orion's Responses to Court's Questions (Corrected) dated May 9, 2000 ("Defs.' Resp. Q."), Diagram at 2 (narrow)). Moreover, recent discussions between the parties concerning "Terminator 3", outlined in Part I.F *infra*, suggest that the right of first negotiation may encompass more than simply distribution rights. This opinion discusses the right in terms of distribution, without excluding the possibility of a broader meaning. Moreover, because the Court's dis-

cussion focuses only on the existence of the right of first negotiation, and not its validity or scope, this ambiguity is inconsequential to the disposition here.

2. Hemdale Leisure Corporation later changed its name to Hemdale Film Corporation, and thereafter had various successors-in-interest. Unless specifically designated in this opinion, Hemdale and all such successors will be referred to as "Hemdale."

3. All exhibits to Vajna and Davidoff declarations will hereinafter be referred to as "AGV Ex. ___."

bution Agreement ¶ 7.03; Foreign Distribution Agreement ¶ 7.03.)[4]

## C. October 1984 Agreements

On October 24, 1984, Hemdale and Orion entered into a series of agreements with two entities purportedly closely linked to Hemdale and to each other: Cinema 84, a New York limited partnership, and Interlink Film Distribution Corporation ("Interlink"), a New York corporation. These agreements, which operated concurrently, apparently provided the parties with certain tax advantages. (Orion Inter–Office Memo dated Dec. 14, 1984, AGV Ex. 7; Defendants' Statement in Response to Plaintiff's Supplemental Statement Concerning Bankruptcy Issues ("Defs.' Mem. Bank.") at 4; Defs.' Resp. Q. at 2.) The Court discusses the agreements in the order considered by the parties in their respective submissions.

Pursuant to a "Purchase Agreement," Cinema 84 acquired all of Hemdale's rights in "Terminator", both domestic and foreign, including sequel rights, for $9.25 million. (Purchase Agreement ¶¶ 1, 3.) The scope of the conveyance was extremely broad, including production and distribution rights as well as the copyrights in the motion picture. (Id. ¶ 1). The distribution rights appear to mirror those granted to Orion via the Hemdale–Orion Agreements, and Hemdale conveyed its rights "subject to" PWP's existing rights in the sequels and remakes, as well as Orion's right of first negotiation "as set forth in Section 7.03 of the [Foreign Distribution Agreement]."[5] (Id. ¶ 1(i).) It was also made "subject ...to the entering into" of three other agreements signed on the same day, through which Cinema 84's rights were reconveyed to Orion and Hemdale: (i) the Interlink Distribution Agreement, (ii) the Orion Sub–Distribution Agreement, and (iii) the "Hemdale Sub–Distribution Agreement." (Id. ¶ 2(a).)

Under the Interlink Distribution Agreement, Cinema 84 conveyed to Interlink its domestic and foreign distribution rights in "Terminator", but not its sequel rights. However, the agreement provided Interlink with a right of first negotiation for sequel rights under equivalent terms to those contained in the Hemdale–Orion Agreements, and further states that Cinema 84 agreed to be bound by any assignment of such right by Interlink to Orion.[6] (Interlink Distribution Agreement ¶ 19.)

That assignment was made in the Orion Sub–Distribution Agreement, to which Interlink, Orion, and Hemdale were parties. Through that agreement, Interlink "returned" to Orion domestic sub-distribution rights to the original "Terminator", originally provided to Orion in the Domestic Distribution Agreement,[7] in consideration for which certain "contingent sub-distribution license fees" would be owed to both Interlink and Hemdale.[8] (Orion Sub–Distribution Agreement ¶ 2.01.) The right of

---

4. Section 7.03 is nearly identical in both Hemdale–Orion Agreements; the only difference is that the parenthetical in the first paragraph of the clause in the Foreign Distribution Agreement excludes "merchandising, music publishing, and soundtrack record rights" from the restrictions on Hemdale's exercise of sequel rights, while the Domestic Distribution Agreement contains no such exclusion.

5. The Purchase Agreement does not mention the right of first negotiation as provided by the Domestic Distribution Agreement, most likely because that agreement was abrogated and replaced by other agreements on October 24, 1984. (See Transcript of Oral Argument dated May 10, 2000 ("Tr.") at 26:1–12.)

6. The agreement also ratified the Orion Sub–Distribution agreement, discussed infra, in which Orion's right of first negotiation is contained, and Hemdale Sub–Distribution Agreement, (Interlink Distribution Agreement ¶ 2(a)), and required Interlink to pay Cinema 84 certain contingent fees and a percentage of "distributors' gross receipts," which included monies received by Orion as sub-distributor. (Id. ¶ 10.)

7. Pursuant to a related Warranty Agreement dated October 24, 1984, Hemdale and Orion agreed to allow the Domestic Distribution Agreement to be superseded by the Orion Sub–Distribution Agreement. (AGV Ex. 6.) This "substitution" of agreements was also expressed in an Orion Inter–Office memo produced several weeks later. (AGV Ex. 7.)

8. Hemdale was, in turn, to make certain third-party participation payments. (Orion Sub–Distribution Agreement ¶ 2.02.)

first negotiation for sequels was provided to Orion under terms similar to those contained in the Domestic Distribution Agreement: (i) the provision implicitly required Interlink's exercise of its right of first negotiation under the Interlink Distribution Agreement, which itself required ratification by Cinema 84; (ii) either Orion or Interlink could then choose to exercise its right under the Sub–Distribution Agreement; and (iii) if either did so, Orion, Interlink and Hemdale would negotiate thereto. (*Id.* ¶ 4.03.) Practically, this rights allocation meant that the production and distribution of sequels would be negotiated by Cinema 84, Interlink, Orion, and Hemdale. As such, this grant appears, at least partly, to return to Hemdale and Orion the sequel rights they had under the Domestic Distribution Agreement.[9] Further, it is clear from this agreement that Hemdale remained the producer of the original film, despite its transfer of rights to Cinema 84. (*Id.* (labeling Hemdale as "Producer").)

Hemdale and Orion re-acquired their foreign distribution rights in the Hemdale Sub–Distribution Agreement, pursuant to which Interlink conveyed its foreign distribution rights in "Terminator" to Hemdale. (Second Declaration of Francis J. Menton, Jr. in Further Support of Defendants' Cross–Motion for Partial Summary Judgment and to Dismiss the Complaint ("Sec-

ond Menton Decl."), Ex. C, ¶ 1.) This agreement also allowed Hemdale to enter into sub-distribution agreements relating to those rights, (*Id.* ¶ 2), and Interlink "ratifie[d] and approve[d]" all sub-distribution agreements previously entered into by Hemdale, in particular the Foreign Distribution Agreement. (*Id.* ¶ 3.)

While the parties to the instant action disagree on the overall effect of the agreements discussed above on defendants' rights, they agree on their existence and validity. In contrast, plaintiff formally challenges the validity of a handwritten agreement between Cinema 84, Hemdale, and Interlink (the "Handwritten Agreement"), which transferred Cinema 84's sequel rights back to Hemdale explicitly subject to Orion's right of first negotiation.[10] (Second Menton Decl., Ex. A.) Plaintiff also urges the court to ignore a letter from Hemdale to Orion (the "Hemdale–Orion Letter"), pursuant to which Hemdale affirmed Orion's right of first negotiation on the basis of the Handwritten Agreement.[11] (*Id.*, Ex. B.)

The Handwritten Agreement completed the cyclical transfer of rights on October 24, 1984, because as a result of its operation, Hemdale and Orion held essentially the same rights they had held at the "beginning of the day," with the exception of (i) certain ancillary sequel rights purportedly held by Cinema 84 and Interlink,[12] (ii)

---

9. The remainder of such rights were returned to Hemdale pursuant to an agreement among Cinema 84, Hemdale, and Interlink (the "Handwritten Agreement"), discussed *infra*.

10. While the Handwritten Agreement references the Orion Sub–Distribution Agreement, it mistakenly states that Cinema 84, rather than Interlink, was one of the parties. (Handwritten Agreement; Tr. at 39: 9–10, 71:7–15.) This mistake has no effect on either agreement's validity.

11. Contrary to defendants' suggestion, this letter is not a contract of any sort. (Statement in Further Support of Defendants' Cross–Motion for Partial Summary Judgment and Dismissal of the Complaint and in Further Opposition to Plaintiff's Motion for Summary Judgment ("Defs.' Stmt. Fur. Supp.") at 3–4.) It is merely an acknowledgment by Hemdale of certain rights then held by Orion.

12. Such ancillary rights are identifiable through the following agreements: Purchase Agreement ¶ 1(i) (grant of ancillary rights); Interlink Distribution Agreement ¶ 19 (including "ancillary or allied rights" in Interlink's right of first negotiation); Handwritten Agreement (transferring "sequel, remake and television series rights"); Purchase and Sale–Quitclaim Agreement dated Sept. 16, 1997 ("Quitclaim Agreement"), AGV Ex. 13 ¶¶ 2.1, 2.4 (distinguishing sequel rights from such ancillary rights in respect of sequels)). Moreover, pursuant to an agreement between Cinema 84 and Hemdale dated December 7, 1984, Cinema 84 granted Hemdale the right to exploit its ancillary rights, and those of Interlink, in exchange for a percentage of Hemdale's proceeds from the exploitation of those rights. (AGV Ex. 10.)

Cinema 84's and Interlink's right to payments arising out of the distribution of the original film, and (iii) Interlink's right to first negotiation for sequels.

 Plaintiff claims that the Handwritten Agreement "should be ignored" because it (i) is "unauthenticated, handwritten, barely legible" and "heavily redacted," (ii) "does not appear to have been prepared by a lawyer," (iii) is invalidated by the integration clauses of the Purchase Agreement and Interlink Distribution Agreement, and (iv) "was most likely concealed by Hemdale and Cinema 84 from their counsel and the Internal Revenue Service." (Plaintiff's Reply Statement Concerning Bankruptcy Code Issues ("Pl.'s Rep. Bank.") at 3.) It adds that, for the same reason, the Hemdale–Orion Letter is invalid. (*Id.* at 4.) However, the fact that the Handwritten Agreement is unauthenticated or handwritten does not affect the validity of the assignment; the agreement, while hard to read, is not illegible, and redactions such as the one referred to here are commonly made by businesses for confidentiality purposes. Moreover, the integration clauses of the Purchase Agreement and Interlink Distribution Agreement expressly provide for written modification upon agreement by the parties. (Purchase Agreement ¶ 16; Interlink Distribution Agreement ¶ 28.) Finally, while this document, like the other agreements prepared on the same day, may have been generated for tax reasons, that does not invalidate the contract, and there is no indication in the record that the agreement was illegally concealed. In short, the document has the required mutuality and consideration necessary for a valid contract, and on the current record, may not be voided as a matter of law.

## D. Subsequent Agreements

Furthermore, the Handwritten Agreement is acknowledged in subsequent agreements, which continued the transfer of rights in "Terminator". First, Cinema 84's assignment of rights to Hemdale forms the basis for Hemdale's subsequent assignment of rights to Carolco International N.V., an affiliate of Carolco Pictures (collectively "Carolco"). Pursuant to an agreement dated January 3, 1990 (the "Hemdale–Carolco Agreement"), Hemdale assigned to Carolco all of its rights in "Terminator", except the right to continue distribution of the original film and to receive monies derived therefrom. (AGV Ex. 11.) If the Handwritten Agreement were invalid, therefore, this transaction would essentially be a nullity, because the agreement would transfer no rights at all. Second, on May 10, 2000, Cinema 84 transferred "any rights [it] has or may have in and to ['Terminator']" to Carolco (the "Cinema 84–Carolco Agreement"), without sacrificing its claims against Hemdale arising out of the latter's distribution of the original film. (AGV Ex. 12.) The rights that Cinema 84 transferred included the ancillary rights associated with "Terminator" sequels which were not transferred to Hemdale via the Handwritten Agreement. Third, in September 1997, plaintiff acquired all of Carolco's rights for $8 million pursuant to the Quitclaim Agreement. (AGV Ex. 13; Declaration of Andrew J. Vajna dated Nov. 18, 1999 ("Vajna Decl.") ¶ 4.)

Both the Hemdale–Carolco Agreement and the Quitclaim Agreement explicitly acknowledged the existence of Orion's right of first negotiation. The Hemdale–Carolco Agreement makes Carolco's acquisition of rights subject to Orion's right of first negotiation as contained in the Foreign Distribution Agreement, (Hemdale–Carolco Agreement ¶ 5, 6.1, Sch. 1),[13] and plaintiff's acquisition of rights from Carolco in the Quitclaim Agreement was expressly subject to certain "Underlying Agreements,"

---

13. The Hemdale–Carolco Agreement does not mention the right of first negotiation as provided in the Orion Sub–Distribution Agreement. While the Court finds that the rights provided by the Distribution Agreements are distinct, *see infra,* certain entities, including defendants in this case, appear to assume that the rights of first negotiation contained in those agreements were overlapping.

including the Orion Sub–Distribution Agreement and the Hemdale–Orion Letter, which respectively create and affirm Orion's rights. (Quitclaim Agreement, Ex. A ¶ 1, 4; Second Menton Decl., Ex. E.)

### E. Orion Bankruptcy Proceedings

In the late 1980s, several years after the release of the original "Terminator", Orion began to encounter financial difficulties, and on December 11, 1991, Orion filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. (Campbell Decl. ¶ 7.) On September 8, 1992, Orion filed a plan of reorganization with the Bankruptcy Court (the "Orion Plan" or "Plan"), which was confirmed on October 20, 1992.[14] (*Id.* ¶ 8; Debtors' Third Amended Joint Consolidated Plan of Reorganization, Ex. B to Campbell Decl.) The Orion bankruptcy proceeding was closed on or about June 16, 1997. (Campbell Decl. ¶ 8.) On or about July 10, 1997, Orion was acquired by MGM. (*Id.* ¶ 12.)

### F. Instant Action

Plaintiff claims to possess the entire gamut of sequel rights in "Terminator", by virtue of the Quitclaim Agreement and a March 1998 agreement whereby plaintiff acquired the second one-half interest in the sequel rights from PWP for $7.5 million. (Compl. ¶¶ 15, 17, 18; Vajna Decl. ¶ 5; AGV Ex. 16.) In December 1998, representatives of plaintiff and defendants met to discuss the distribution of a third "Terminator" movie, "Terminator 3", which meeting defendants claim originated because of Orion's right of first negotiation, and plaintiff claims it attended without prejudice to its position that Orion no longer had such right. (Declaration of Frank Mancuso in Opposition to Plaintiff's Motion for Summary Judgment dated Jan. 12, 2000 ¶¶ 5–6, 8; Plaintiff's Statement of Material Facts Pursuant to Local Rule 56.1 ("Pl.'s 56.1") ¶ 10.) At the meeting and in subsequent written correspondence, plaintiff expressed its intention to make one or more "Terminator" sequels and/or television specials, and proposed a deal that would include (i) repayment to plaintiff of approximately $16.5 million in development costs (including the $15.5 million in acquisition costs under the 1997 and 1998 agreements, legal fees, and interest), (ii) MGM funding further development of sequels, and (iii) a producer/executive producer contract for plaintiff and its principals. (Pl.'s 56.1 ¶ 10; Letter from Mario Kasar to Frank Mancuso dated Dec. 18, 1998, AGV Ex. 17; Letter from Brian Davidoff to Carl L. Grumer dated Dec. 21, 1998, AGV Ex. 15 (noting that the proposal was without prejudice to plaintiff's position that it was not obligated to negotiate with defendants).) MGM refused, but reserved its rights to future sequels. (Letter from Frank Mancuso to Andy Vajna dated Feb. 4, 1999, AGV Ex. 18.) Thereafter, plaintiff sent a letter to defendants stating that its proposal had been "a package for the current project as well as all future productions," and that by not participating in "Terminator 3", MGM had forfeited its rights to future sequels. (Letter from Andy Vajna to Frank Mancuso dated Feb. 12, 1999, AGV Ex. 19.)[15]

Plaintiff filed this action on September 20, 1999 seeking a declaration, pursuant to 28 U.S.C. § 2201, that defendants' right of first negotiation is invalid and unenforceable. Plaintiff's claims, which treat both federal and state law,[16] center on the Orion bankruptcy proceeding, asserting that Or-

---

14. The specific terms of the Plan, as they apply to Orion's purported right of first negotiation, are discussed in Part II.B, *infra.*

15. Defendants claim that the letter they received was dated February 16, 1999. (Defendants' Statement in Response to AGV's Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Defs.' 56.1 Resp.") ¶ 13.)

16. While plaintiff's allegations under federal and state law do not constitute separate counts in its Complaint, plaintiff asserts separate claims under federal bankruptcy and state contract law, which the parties both treat separately in their respective submissions. The Court also treats the federal and state claims separately.

ion's rights (i) were eliminated before the bankruptcy through the operation of the October 1984 agreements, or (ii) did not survive the bankruptcy because they were rejected by the Orion Plan. (Compl. ¶ 28; Pl.'s 56.1 ¶¶ 14–22). In the alternative, plaintiff claims that under state law, (iii) defendants' right of first negotiation is invalid because the clause embodying the right is "is nothing more than an unenforceable agreement to attempt to negotiate," (Compl.¶¶ 23, 28d), and (iv) even if the right were enforceable, plaintiff has fully satisfied its obligations under those rights through its negotiations with MGM concerning "Terminator 3". (Compl. ¶ 28e; *see generally* Tr. at 7:1–7.)

In its motion for summary judgment, plaintiff elaborates on these claims, stating that summary judgment is proper because there is no issue of material fact on any of the above four assertions. (Plaintiff's Memorandum of Law in Support of Summary Judgment ("Pl.'s Mem.") at 1–2.) In their cross-motion for partial summary judgment and for dismissal of the Complaint, defendants contend that (i) Orion's right of first negotiation as embodied in the Hemdale–Orion and Orion–Sub Distribution Agreements survived the bankruptcy because the agreements were novated under the Orion Plan, and (ii) plaintiff's state claims should be dismissed for lack of subject matter jurisdiction, because the federal bankruptcy claim is a narrow one and in the absence of that claim, "this action is essentially nothing more than a basic contract dispute arising under agreements performed in California, governed by California law, and between and among three California companies." (Memorandum of Law in Support of Defendants' Cross–Motion for Partial Summary Judgment and Dismissal of the Complaint and in Opposition to Plaintiff's Motion for Summary Judgment ("Defs.' Mem.") at 16.) They also reject plaintiff's suggestion that MGM's refusal to participate in "Terminator 3" precludes them from exercising its right of first negotiation as to further sequels. (*Id.* at 10, 26–28.) Finally, if the Court declines to grant their summary

judgment motion, defendants seek additional discovery under Fed.R.Civ.P. 56(f) ("Rule 56(f)") in order to depose individuals who were involved in the negotiation of the Hemdale–Orion agreements and can provide evidence concerning the intent of the parties in drafting the right of first negotiation provision. (Reply Memorandum of Law in Further Support of Defendants' Cross–Motion for Partial Summary Judgment and Dismissal of the Complaint ("Defs.' Rep.") at 14–15; Declaration of Francis J. Menton, Jr. in Support of Defendants' Request for Denial or Continuance of Plaintiff's Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(f).)

The Court heard oral argument on May 10, 2000. The discussion below centers on plaintiff's federal claims, and because the Court dismisses those claims, we defer the adjudication of the state claims to the California courts.

## II. Discussion

### A. Summary Judgment Standard

A district court may grant summary judgment only if it is satisfied that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact, which may be satisfied if it can point to the absence of evidence necessary to support an essential element of the non-moving party's claim. *See Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All inferences and ambiguities are resolved in favor of the party against whom summary judgment is sought. *See Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994) (citations omitted).

If the moving party meets its burden, the opposing party must produce evidentiary proof in admissible form sufficient to raise a material question of fact to defeat the motion for summary judgment, or in the alternative, demonstrate an acceptable excuse for its failure to meet this requirement. *See Kolp v. New York State Office of Mental Health,* 15 F.Supp.2d 323, 326 (W.D.N.Y.1998). When reasonable minds could not differ as to the import of the proffered evidence, then summary judgment is proper. *See Anderson, supra,* 477 U.S. at 250–52, 106 S.Ct. 2505; *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). Moreover, "mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir.1996).

In this case, plaintiff is seeking summary judgment on its claim that defendants' purported rights in "Terminator" are unenforceable and/or were extinguished through the operation of certain contracts, and defendants have cross-moved for partial summary judgment to assert the validity of those rights. On cross-motions for summary judgment, the rule governing inferences and burden of proof is the same as for unilateral summary judgment motions. *See Straube v. Fla. Union Free Sch. Dist.,* 801 F.Supp. 1164, 1174 (S.D.N.Y.1992). That is, each cross-movant must present sufficient evidence to satisfy its burden of proof on all material facts. *See Barhold v. Rodriguez,* 863 F.2d 233, 236 (2d Cir.1988) (citing *Eastman Machine Co. v. United States,* 841 F.2d 469, 473–74 (2d Cir.1988)); *see also Prowse v. IRS,* No. 89 Civ.2084, 1992 WL 330213, at *1 (E.D.N.Y.).

## B. Defendants are Entitled to Partial Summary Judgment [17]

The record reflects that in 1983, Orion acquired certain domestic and foreign distribution rights, and a right of first negotiation as to sequel distribution rights. These rights were retained in spite of the complicated assignment of rights that occurred in the October 1984 agreements, and the agreements in which the rights were contained were novated in 1992 pursuant to the Orion Plan.

### 1. Orion's Distribution Rights, and its Right of First Negotiation, Survived the Operation of the October 1984 Agreements

The Hemdale–Orion Agreements provided Orion with domestic and foreign distribution rights in "Terminator", and a right of first negotiation as to sequels. The rights of first negotiation granted by the respective agreements are distinct.[18] The clauses encompassing the rights are parallel in wording, but not identical. They appear in different agreements covering distribution in distinct territories, and, accordingly, could operate separately with regard to most, if not all, of the rights which they include. Therefore, the transfer and survival of those rights will be considered separately by the Court.

The path of the foreign distribution rights is clear and uncontroversial. On October 24, 1984, Hemdale transferred foreign distribution rights to Cinema 84 in the Purchase Agreement. While the distribution rights themselves appear to overlap with those earlier granted to Orion, the transfer was expressly subject to Orion's right of first negotiation as set forth in the

---

**17.** The Court notes that AGV did not submit a Local Rule 56.1 statement in response to defendants' 56.1 statement submitted pursuant to defendants' motion for partial summary judgment. While the failure to submit such a statement is grounds for deeming admitted the facts contained in defendants' statement, the Court is not required to do so. *See Balut v. Loral Elec. Sys.,* 988 F.Supp. 339, 343 (S.D.N.Y.1997). The Court chooses not to regard plaintiff's omission as an admission to all of the facts in defendants' 56.1 statement, in particular because plaintiff has submitted a 56.1 statement in support of its own motion.

**18.** Defendants have suggested that the right of first negotiation in the Foreign Distribution Agreement applied to "Terminator" sequels generally. (Defs.' Mem. Bank. at 1; Tr. at 58:11 to 59:3, 61:6–17.) This contention is unavailing for the reasons stated herein.

Foreign Distribution Agreement. After the conveyance of the foreign distribution rights to Interlink, Interlink then passed them on to Hemdale via the Hemdale Sub–Distribution Agreement. That agreement explicitly allowed the Foreign Distribution Agreement to remain in force in its original form, as Interlink ratified all "sub-distribution agreements" previously entered into by Hemdale, and specifically referenced the Foreign Distribution Agreement. In return for such rights, Orion was obligated, *inter alia*, to pay Hemdale license fees based on Orion's foreign distribution revenues. The Court therefore concludes, and the parties do not appear to disagree, (Plaintiff's Supplemental Statement Concerning Bankruptcy Issues ("Pl.'s Mem. Bank.") at 4, Diagram; Defs.' Mem. Bank. at 1), that as of the commencement of its bankruptcy proceeding, Orion had foreign distribution rights for the original "Terminator", and a right of first negotiation for the foreign distribution of sequels.

The path of Orion's right of first negotiation connected to its domestic distribution rights is more complex. On October 24, 1984, Orion's domestic distribution rights were abrogated via the Purchase Agreement, in which Hemdale conveyed its domestic rights to Cinema 84, and the Warranty Agreement as described in the Orion Inter–Office Memo, in which Orion agreed that the Domestic Distribution Agreement would be superseded by the Orion Sub–Distribution Agreement. These rights were promptly reconveyed to Orion via the Orion Sub–Distribution Agreement in exchange for license fees payable to both Interlink and Hemdale. Pursuant to the Orion Sub–Distribution Agreement, Interlink granted Orion a right of first negotiation for "Terminator" sequels, which was specifically exercisable by either Interlink or Orion and implicitly dependent on Cinema 84's ratification under the Interlink Distribution Agreement. At the same time, Orion's right of first negotiation as to

the domestic distribution of "Terminator" sequels was separately acknowledged in the Handwritten Agreement, and the Hemdale–Orion Letter. Subsequently, the transfers to Carolco in 1990, via the Hemdale–Carolco Agreement and Cinema–84 Carolco Agreement, left undisturbed Orion's domestic distribution rights in the original film and its right of first negotiation concerning sequels. Thus, on the eve of the bankruptcy, these rights would appear to have been neatly preserved.

However, Interlink was dissolved as a going concern in September 1991 pursuant to New York State Tax Law. (Affidavit of Brendan R. Marx dated May 9, 2000, Ex. A.) Plaintiff claims that because Interlink could not thereafter exercise its right of first negotiation, Orion's right of first negotiation, which was dependent on Interlink, was invalid as a matter of law. (Plaintiff's Memorandum of Law Concerning Interlink Dissolution dated May 9, 2000 at 1, 4.; Tr. at 10:1–3, 84:12–20.) Therefore, plaintiff claims that Orion could not have had this right at the commencement of its bankruptcy proceedings. While the exercise of Orion's right of first negotiation may have been dependent on the holder of sequel rights, i.e. Cinema 84 or Hemdale, there is nothing in the record to indicate that the existence of that right was dependent on Interlink.[19] The fact that Interlink never got to, and was not able to (*see* note 26, *infra*), exercise its right of first negotiation is irrelevant to the survival of Orion's rights under the Sub–Distribution Agreement. The Sub–Distribution Agreement was not invalidated by Interlink's dissolution because Orion, Interlink, *and Hemdale* were parties. Moreover, because Hemdale held the sequel rights by virtue of the operation of the Handwritten Agreement, it could negotiate with Orion under Orion's right of first negotiation. Moreover, even if the Handwritten Agreement were invalid, Cinema 84 could trigger the negotiation of sequel rights with

---

19. Plaintiff has been unable to explain how Orion's right to first negotiation was dependent on the actions of, or continued existence of, Interlink. (Tr. at 28:8 to 31:11.)

both Orion and Hemdale, because in the Interlink Distribution Agreement Cinema 84 specifically agreed, as the holder of such sequel rights, to be bound by the assignment of rights to Orion.[20]

The Court therefore finds that, as of the commencement of its bankruptcy proceeding, Orion had domestic and foreign distribution rights in the original "Terminator", and a right of first negotiation for the domestic and foreign distribution of sequels. The October 1984 agreements, entered into for tax purposes, appear to have been "painstakingly crafted so as not to disturb the substantive rights and obligations of the parties," specifically Hemdale and Orion. (Defs.' Stmt. Fur. Supp. at 2.) These agreements succeeded and/or superseded the Hemdale–Orion Agreements without altering the parties' economic rights in any manner material to this dispute.

### 2. The Distribution Agreements [21] Were Novated by the Orion Plan

#### a. Executory Contracts Under the Orion Plan

The Orion Plan rejected, in accordance with Sections 365 and 1123 of the Bankruptcy Code,[22] all executory contracts, with the exception of certain defined categories. (Plan § 12.04). The Plan specifically excluded from this blanket rejection: (i) "contracts that are otherwise treated under the Plan that give rise to Participation Claims or Residual Claims" and are not listed on any "Schedule of Rejected Executory Contracts" filed by Orion on or before the entry of the order confirming the Plan (the "Confirmation Order"); (ii) contracts listed on any "Schedule of Assumed Executory Contracts" or "Schedule of Assumed Unexpired Leases"; and (iii) any contract assumed or rejected prior to entry of the Confirmation Order. (Id.)

The parties agree that the Distribution Agreements were executory contracts, as each involved promises to perform for an indefinite time in the future.[23] The parties also agree that the Agreements did not give rise to "residual claims," were not listed on any schedule as a either a "rejected" or "assumed" executory contract, and

---

20. Plaintiff also suggests that Orion's right of first negotiation did not make it to the bankruptcy because it was subject to Cinema 84's approval and they never acted. (Tr. at 10:4–5.) This contention is unavailing because (i) Orion's right was not dependent on such action; rather the right preserved each party's ability to act in the future to allocate sequel rights, and (ii) in any event, Cinema 84's actions were irrelevant after the transfer of sequel rights to Hemdale via the Handwritten Agreement.

21. In this section, the Court refers to the Domestic Distribution Agreement, as superseded by the Orion Sub–Distribution Agreement, and the Foreign Distribution Agreement, as the "Distribution Agreements." (Memorandum of Law in Support of Debtors' Motion for an Order Disallowing and Expunging Claim No. 2626, Supplemental Declaration of Brian L. Davidoff dated Jan. 26, 2000 ("Supp. Davidoff Decl."), Ex. B, at 3–4.)

22. Section 365 governs the assumption or rejection of executory contracts and unexpired leases by the designated bankruptcy trustee. Section 1123 governs the contents of a plan of reorganization, and, inter alia, requires the specification of claims or interests not impaired by the plan, and provides for the assumption or rejection of executory contracts

and unexpired leases pursuant to section 365. See 11 U.S.C. §§ 365(a), 1123(a)(2), (b)(2).

23. The Agreements included the obligation to indemnify and defend Orion and its assigns for any future damages or losses, and Orion's underlying promise to pay a certain percentage of its distribution revenues from the original "Terminator". (Foreign Distribution Agreement ¶¶ 6.02, Ex. A; Orion Sub–Distribution Agreement Ex. 1; cf. Warranty Agreement ¶ 3(b).). Both Hemdale and Interlink also promised that they would neither assign rights to any other entity that would conflict with Orion's rights nor authorize or permit any other entity to authorize the distribution of the film for a certain period of time in the future. (Foreign Distribution Agreement ¶ 6.01(d); Orion Sub–Distribution Agreement §§ 3.01(b), 4.02.) Moreover, under both Agreements, the right of first negotiation provides for the satisfaction of reciprocal obligations to negotiate on and allocate sequel rights at some point in the future. See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 522 n. 6, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (defining executory contract as a contract "on which performance is due to some extent on both sides"); In re Qintex Entertainment, Inc., 950 F.2d 1492, 1496 (9th Cir.1991) (finding executory contract existed between distribu-

were neither assumed nor rejected prior to the entry of the Confirmation Order. (Pl.'s Mem. Bank. at 3 n. 2; Letter from Carl L. Grumer to Brian L. Davidoff dated May 22, 1998, AGV Ex. 9.) Rather, the dispute over these Agreements, and in particular, the survival of Orion's right of first negotiation therein, centers on the notion of "participation claim." The Plan defines "Participation Claim" as follows:

> "[A]ll claims against the debtors in connection with the acquisition, production, financing, distribution, exhibition or exploitation of motion pictures and television productions, based upon contracts existing on the Filing Date with one of the Debtors, or upon contracts existing on the Filing Date under which one of the Debtors was entitled to receive or received benefits or under which it assumed obligations ... the payment of which is ... contingent upon and payable only to the extent of the receipt by [Orion] of revenues from the exploitation of such motion picture or television production ..." (Plan § 1.84.)

The agreements giving rise to participation claims are not rejected, but are novated under the Plan for the benefit of the claimant. In particular, the Plan provides that:

> "Each contract of each holder of a Postconfirmation Participation Claim[24] in Class 6 shall, as of the Effective Date, be extinguished and of no further force or effect, and shall ·be deemed to be superseded and replaced by a reformed and novated contract containing the same prospective terms and conditions as such contract with the relevant Debtor ... The only parties to such reformed and novated contract shall be the holder of such Postconfirmation Participation Claim and the particular Debtor that was a party to the contract so reformed and novated." (Plan § 5.05(a)(ii).)

Participation claims, in turn, trigger the obligation of "participation payments," made by Orion to the claimant over a period of time in order to satisfy monies owed.

Pursuant to the Plan, Hemdale filed proofs of claim with the Bankruptcy Court in order to recoup monies then due and due in the future from Orion under the Distribution Agreements. (Defs' Mem. Bank at 3; Supplemental Affidavit of Nancy R. Stone ¶¶ 3–4.) Orion issued two promissory notes (so-called "Talent Notes") to Hemdale and/or its successors-in-interest, one pursuant to the Domestic Distribution Agreement[25] and the other pursuant to the Foreign Distribution Agreement, in settlement of all payment obligations included in any pre-confirmation participation claims arising under those agreements. (Defendants' Statement of ·Material Facts Pursuant to Local Civil Rule 56.1 ("Defs.' 56.1") ¶ 26; Campbell Decl. ¶¶ 11.) For a period of time up to and including July 13, 1998, Orion made participation payments to Hemdale and its

---

tor and producer where producer contracted to refrain from selling sub-distribution rights to third parties and to indemnify and defend the distributor); Black's Law Dictionary at 321 (7th ed.1999).

**24.** Participation claims are categorized either as "pre-confirmation" or "post-confirmation," depending on when they accrued in relation to the entry date of the Confirmation Order, September 30, 1992. (Plan § 1.92.) A single claim filed with the Bankruptcy Court could therefore trigger both pre- and post-confirmation claims under the Plan if monies are due before and after the entry date. (Plan § 1.01 (participation claims "accrue" when the payments thereunder are due.)

**25.** Hemdale's claim was couched in terms of the Domestic Distribution Agreement, rather than the Orion Sub–Distribution Agreement, under which its claim to domestic distribution revenues would more properly lie. Orion's participation payments to Hemdale encompassed monies owed based on domestic revenues, which suggests that Orion, and possibly the Bankruptcy Court, interpreted Hemdale's claim to refer to the Sub–Distribution Agreement. Further, the record reflects that Hemdale, which was closely linked to Interlink, received participation payments on behalf of Interlink, which also seems to indicate that its claim encompassed the Sub–Distribution Agreement. (Third Declaration of Francis J. Menton, Jr. in Further Support of Defendants' Cross–Motion for Partial Summary Judgment and to Dismiss the Complaint ("Third Menton Decl."), Ex. B.)

successors pursuant to both agreements, representing a percentage of the revenues received by Orion for "Terminator" up to April 30, 1998. (Defs.' 56.1 ¶ 29–32; Campbell Decl. ¶¶ 13–15.) In January 1999, MGM acquired Hemdale's successor-in-interest Epic Pictures Enterprises ("Epic"), which obviated any further participation payments originally owed to Hemdale. (Defs.' 56.1 ¶ 33; Campbell Decl. ¶¶ 16–18.)

On or about May 27, 1992, Interlink filed a participation claim in the Orion bankruptcy for the monies owed to it by Orion under the Orion Sub–Distribution Agreement. (Third Menton Decl. ¶¶ 2–3, Ex. A; Tr. at 46:14–15.) Orion issued talent notes to Interlink pursuant to the agreement, apparently in settlement of pre-confirmation sums, and made participation payments to Interlink at least until 1995.[26] (Third Menton Decl., Ex. B.)

### b. Survival of the Distribution Agreements

 In its summary judgment motion, plaintiff claims that even if Orion's right of first negotiation survived the October 1984 agreements and Interlink dissolution, the right was rejected in Orion's bankruptcy proceedings. First, plaintiff contends that neither of the Distribution Agreements gave rise to a participation claim under the Orion Plan encompassing the right of first negotiation. Specifically, plaintiff alleges that the right of first negotiation does not give rise to a "claim" under the Bankruptcy Code, because claims require a right to

payment[27] and "it is manifestly impossible to determine the amount, if any, which would compensate the Producer for Orion's breach of its obligation to negotiate in good faith." (Pl.'s Mem. at 22.) Accordingly, plaintiff asserts that because the right of first negotiation for sequels was not reducible to a monetary claim, the agreement containing that right could not be novated. (Pl.'s Mem. Bank. at 2–3.) Second, it contends that even if the right of first negotiation were novated, it could not operate against plaintiff, or any of its predecessors-in-interest. (*Id.;* Pl.'s Rep. Bank. at 2; Supp. Davidoff Decl. ¶¶ 14–15.) In particular, plaintiff points out that neither plaintiff nor its predecessors-in-interest, which held the sequel rights to "Terminator" at the time of the Orion bankruptcy, contracted with Orion directly or were holders of post-confirmation participation claims. (Pl.'s Mem. Bank. at 3.) Thus, any novated right of first negotiation could only apply to parties to that reformed and novated contract, namely Hemdale or Interlink, which held no sequel rights at the time of the bankruptcy. (Supp. Davidoff Decl. ¶ 14.)

 Plaintiff's contentions are unavailing for three reasons. First, plaintiff focuses only on the sequel rights, and specifically the right of first negotiation, rather than the Distribution Agreements themselves. By the terms of the Orion Plan, however, participation claims give rise to the reformation and novation of an entire contract. Orion could not have assumed

---

**26.** Plaintiff points to Interlink's dissolution in 1991 in arguing against that company's ability to "exercise any rights whatever." (Pl.'s Mem. Bank. at 4.) However, New York's tax law only prohibits a company from entering into "new business" after dissolution, and specifically excludes actions to recover on contracts existing previous to dissolution. *See* New York Business Corporation Law § 1006(b) (providing that a corporation continues to exist as a legal entity after its dissolution for the purposes of actions and proceedings with respect to rights and claims existing prior to dissolution); *id.* § 1005 (providing that "new business" is prohibited); *Metered Appliances, Inc. v. 75 Owners Corp.,*

225 A.D.2d 338, 638 N.Y.S.2d 631, 631 (App. Div.1996) (corporation dissolved pursuant to tax law may not undertake new business "absent reinstatement by payment of back taxes"); *Lorisa Capital Corp. v. Gallo,* 119 A.D.2d 99, 506 N.Y.S.2d 62, 70 (2d Dep't 1986). Thus, while Interlink may have been prohibited from exercising its right of first negotiation under the Orion Sub–Distribution Agreement after 1991, it could recover sums owed to it under that agreement.

**27.** *See* 11 U.S.C. § 101(5)(A) (defining "claim" as "right to payment whether or not such right is reduced to judgment").

some of the provisions of an agreement and rejected others, because under the law of bankruptcy a contract cannot be assumed in part or rejected in part. *See NLRB, supra,* 465 U.S. at 531, 104 S.Ct. 1188 ("If an executory contract is assumed, it is said to be assumed *cum onere,* with all of its benefits and burdens."); *In re Leslie Fay Cos., Inc.,* 166 B.R. 802, 808 (S.D.N.Y. 1994) ("An executory contract cannot be assumed in part and rejected in part."); *In re Atlantic Computer Sys., Inc.,* 173 B.R. 844, 849 (S.D.N.Y.1994) (noting that a debtor may not "cherry-pick" pieces of a contract it wishes to assume or reject).[28]

Second, because plaintiff focuses on the right of first negotiation rather than the agreements, it downplays the importance of the rights of Hemdale and Interlink, both of which did contract directly with Orion, filed participation claims with the Bankruptcy Court, and were thereby holders of novated contracts. The Distribution Agreements gave rise to participation claims against Orion because (i) the claims were "in connection with the acquisition, production, financing, distribution, exhibition or exploitation" of "Terminator", (ii) the agreements were in existence on December 11, 1991, the filing date of Orion's bankruptcy petition, (iii) Orion was granted certain rights in exchange for its obligations to pay a percentage of its distribution revenues, and (iv) these payments were contingent upon Orion's receipt of revenues.[29] (Plan § 1.84.) Moreover, these claims were post-confirmation participation claims because they involved monies due for an indefinite time beyond the entry date of the Plan's Confirmation Order. Because the agreements gave rise to post-confirmation participation claims held by Hemdale and Interlink, those agreements were, by operation of the Plan, deemed "extinguished" and "superseded by a reformed and novated contract containing the same prospective terms and conditions."[30] (Plan § 5.05(a)(ii).)

In a supplemental declaration, plaintiff's counsel states that defendants merely "assert that the "Terminator" agreements must necessarily have given rise to participation claims under the Orion Plan because defendants claim to have made payments to Hemdale and its successors-in-interest during the years following the confirmation of [the Plan]." (Supp. Davidoff Decl. ¶ 12.) However, the Distribution Agreements gave rise to participation claims by the terms of the Plan because the Agreements obligated Orion to make payments contingent upon its receipt of revenues from the distribution of "Terminator". (Plan §§ 1.84.) The subsequent participation payments to Hemdale and Interlink were in accordance with the reformed and novated agreements, and provide support for the conclusion that the agreements were in fact novated. (*Id.*); *see Apex Oil Co. v. Vanguard Oil & Serv. Co.,* 760 F.2d 417, 422 (2d Cir.1985) (finding that under New York law, "the exis-

---

**28.** The Bankruptcy Court also considered the Distribution Agreements as a whole, irrespective of the fact that the sequel rights had been clearly distinguished from the rights related to the original film. (Tr. at 46:1–24.)

**29.** The Distribution Agreements gave rise to "claims" under the Code and the Orion Plan, because they triggered a "right to payment" on behalf of Hemdale for an indefinite period in the future. *See* 11 U.S.C. § 101(5)(A); *Cohen v. Cruz,* 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) (stating that "right to payment" is "nothing more nor less than an enforceable obligation") (citation omitted); (Plan § 1.25; Orion Sub–Distribution Agreement ¶ 2.01; Foreign Distribution Agreement ¶ 5.01.)

**30.** The conditions for such novation were satisfied, because, as noted *supra,* Orion, as reorganized, made participation payments to Hemdale, its successor Epic, and Interlink for sums equal to the percentage of "Terminator" revenues to which they were entitled under the Distribution Agreements. (Campbell Decl., Exs. C–F; Third Menton Decl., Ex. B; Defs.' Mem. at 13–14.) Further, if Hemdale's claims are interpreted as being brought pursuant to the Orion Sub–Distribution Agreement, *see supra* note 25, then Interlink's claim would not be required for a finding of novation under that agreement.

tence of a contract may be established through conduct of the parties recognizing the contract").

Third, Orion's novated right of first negotiation can operate against plaintiff. Plaintiff and its predecessors-in-interest all acquired their sequel rights subject to Orion's right of first negotiation. Carolco acquired its rights from Hemdale expressly subject to that right, and while the Cinema 84–Carolco Agreement does not directly mention Orion's right, Cinema 84 had acquired its interests in "Terminator" subject to the right and acknowledged it in the Handwritten Agreement, pursuant to which sequel rights were "returned" to Hemdale.[31] Furthermore, plaintiff's acquisition of rights in 1997 was expressly subject to the Orion Sub–Distribution Agreement, which contained the right of first negotiation, and the Hemdale–Orion Letter, which affirms that right. Plaintiff cannot now claim to have acquired more rights than it was sold.[32]

Because both the Foreign Distribution Agreement and the Orion Sub–Distribution Agreement were reformed and novated under the Plan, and Orion's right of first negotiation, along with the other pro-

visions of the agreements, continued to have effect after the bankruptcy proceedings, the Court finds that MGM is the current owner of a right of first negotiation in connection with the distribution of "Terminator's" domestic and foreign sequels. Therefore, defendants' motion for partial summary judgment is granted.[33]

## C. State Law Claims

■ Because the Court has dismissed plaintiff's sole claims under federal law, it must consider whether to retain jurisdiction over plaintiff's state law claims, which invoke the Court's consideration of the validity and scope of defendants' right of first negotiation, as well as the current obligations of plaintiff and defendants thereunder. The Court finds that it would be inadvisable to maintain jurisdiction over this action to adjudicate these claims, which center on contracts performed in California, involve three California parties,[34] and are governed principally by California law.[35]

Where it has original jurisdiction over a claim, a federal district court may exercise supplemental jurisdiction over all other claims that are so related to that claim

---

31. The fact that Cinema 84 had transferred most of its sequel rights back to Hemdale by 1990 may explain why Orion's right of first negotiation was not specifically acknowledged in the Cinema 84–Carolco Agreement.

32. In a memorandum submitted to the Court at oral argument, plaintiff contends that the "subject to" language in the relevant agreements is meaningless, because the agreements do not "acknowledge any rights on the part of Orion." (Plaintiff's Memorandum of Law Concerning "Subject To" Recitals at 2–3.) However, plaintiff does not contest that several of the agreements specifically acknowledge the right of first negotiation or the agreements in which that right is contained. (*Id.*) Its principal argument is that the agreements leave open the issue of the validity of the right of first negotiation as against plaintiff, an issue which is dependent on state law. (*Id.* at 4–7.) The Court declines to consider such arguments here. *See* Part C, *infra*.

33. Accordingly, defendants' request for additional discovery pursuant to Rule 56(f) is denied as moot.

34. While it was incorporated in New York, Orion moved its principal place of business from New York to California in 1993, and, as noted *supra*, was acquired by MGM in 1997. (Campbell Decl. ¶¶ 4, 12.)

35. The principal agreements treating Orion's right of first negotiation, and all the agreements involving Orion, are governed by California law. (Domestic Distribution Agreement ¶ 8.04, Foreign Distribution Agreement ¶ 8.04, Orion Sub–Distribution Agreement ¶ 6.04, Hemdale–Carolco Agreement ¶ 10, Cinema 84–Carolco Agreement ¶ 5(a), Quitclaim Agreement ¶ 9.) The Purchase Agreement, Interlink Distribution Agreement, and Hemdale Sub–Distribution Agreement are governed by New York law. (Purchase Agreement ¶ 13; Interlink Distribution Agreement ¶ 26; Hemdale Sub–Distribution Agreement ¶ 23.) None of the other agreements specify governing law.

that they form part of the same case and controversy. 28 U.S.C. § 1367(a). Similarly, the district court may decline to exercise jurisdiction if (i) the claim raises a novel or complex issue of state law; (ii) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (iii) *the district court has dismissed all claims over which it has original jurisdiction,* or (iv) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c) (emphasis added). The decision to dismiss state law claims is left to the discretion of the district judge. *See Purgess v. Sharrock,* 33 F.3d 134, 138 (2d Cir.1994).

In deciding whether to exercise supplemental jurisdiction, the Court should consider whether an exercise of jurisdiction is justified by the interests of judicial economy, convenience, fairness to litigants, and comity. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Where all federal claims have been dismissed before trial, and especially before discovery on the state claims, these factors shall "point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *Shchegol v. Rabinovich,* No. 98 Civ. 5616, 1999 WL 398025, at *8 (S.D.N.Y.) (declining to exercise supplemental jurisdiction over state law claims in advance of discovery where plaintiffs could "continue to pursue this action in the state court"); *Sanders v. Gold Key Lease, Inc.,* 906 F.Supp. 197, 202 (S.D.N.Y.1995) (declining to exercise supplemental jurisdiction over state law claims where federal claims were dismissed at a preliminary stage).

While the principle as expressed in *Cohill* is not "a mandatory rule to be applied inflexibly in all cases," *Cohill, supra,* 484 U.S. at 350 n. 7, 108 S.Ct. 614 it is applicable in this case.

First, this Court has little interest in resolving a California contract dispute between California parties governed under California law. Contrary to plaintiff's suggestion, this Court's familiarity with the state law issues is incidental at best. (Plaintiff's Memorandum of Law in Opposition to Defendants' Cross–Motion for Summary Judgment and in Further Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Opp.") at 6.) The fact that there are not, as plaintiff claims, any "novel issues of state law" favoring state court adjudication is immaterial in this case, even if it were true. (*Id.*) Moreover, because the California courts are more familiar with the issues in question, which, according to plaintiff are "straightforward and less complex" than the federal claims, (Pl.'s Rep. Bank at 5), there is unlikely to be a disproportionate expenditure of judicial resources in state court. Judicial economy therefore supports dismissal.

Second, the convenience of the parties militates in favor of dismissal, because the parties, as well as the lawyers with experience on matters of California contract law, are located in California. Moreover, the sources of evidence relating to the formation of the relevant agreements and the disputes arising out of those agreements are also located in California..

Third, fairness to the parties does not require maintenance of the instant action. Because this matter has not progressed beyond the pleadings stage, (Menton 56(f) Decl. ¶ 5), there will not be any unfair prejudice to either side if certain issues of state law are relitigated in state court. The full briefing of the contract issue by the parties, assuming that is true, does not tilt the balance toward New York; nor does the fact that this Court has heard some of the relevant arguments. *See Freer v. Mayer,* 796 F.Supp. 89, 94 (S.D.N.Y.1992) (dismissing state law claims upon dismissal of federal claim in a 14 month old case where the court had conducted several conferences and decided motions); (Pl.'s Opp. at 6.). If, as plaintiff asserts, the state law claims require the resolution of strictly legal issues, and discovery is not required, plaintiff can seek relief immediately in state court and the

**394**

possible delay of proceedings is minimal. *See Freer, supra,* 796 F.Supp. at 94 (stating that plaintiff suffers no prejudice where he can re-file state law claims in state court); (Pl.'s Mem. at 1; Pl.'s Opp. at 6.) If, as defendants assert, the ambiguities concerning the scope of the right of first negotiation necessitate further discovery, (Defs.' Rep. at 14–15), the imperative of a prompt decision on the state law issues becomes irrelevant. Moreover, such discovery should occur in California and be overseen by a California court.

Finally, the California courts are more familiar with the applicable law, as well as the context within which the relevant contracts were executed. These are complex issues that would be better resolved in a state forum on the grounds of fairness and comity. *See Gibbs, supra,* 383 U.S. at 726, 86 S.Ct. 1130 (stating that decisions of state law not required to be adjudicated in federal court "should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer footed reading of applicable law").

Therefore, the Court declines to exercise supplemental jurisdiction over the claims in this action, and dismisses these claims without prejudice for lack of subject matter jurisdiction. *See Gibbs, supra,* 383 U.S. at 726–27, 86 S.Ct. 1130. Plaintiff is therefore free to re-file the action, on the basis of its state law claims, in California court.

**D. Plaintiff's Motion for Summary Judgment**

Because the Court has granted partial summary judgment to defendants on the survival of Orion's right of first negotiation

and dismissed plaintiff's state law claims, summary judgment on plaintiff's claim for declaratory relief must be denied.[36]

**III. Conclusion**

For the foregoing reasons, the Court finds that there is no issue of material fact concerning MGM's ownership of a right of first negotiation for "Terminator" sequel distribution rights. Accordingly, defendants' motion for partial summary judgment is granted and plaintiff's motion for summary judgment is denied. The Court also dismisses plaintiff's state law claims concerning the validity and scope of defendants' rights for lack of subject matter jurisdiction, without prejudice to plaintiff's ability to re-file in California state court. SO ORDERED.

**36.** Even if the Court were to retain jurisdiction over the state law claims, significant issues of material fact related to the nature of the right of first negotiation would preclude summary judgment for plaintiff on these claims. *See Seiden Assocs. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992) (holding that when reasonable minds could differ on the meaning of the language used, the meaning of the words becomes an issue of fact if there is relevant extrinsic evidence of the parties' actual intent). Such issues involve (i) with respect to the validity of the right, how the right was originally conveyed to Orion, (ii) with respect to the scope of the right, what rights are covered and how those rights are to be exercised, and (iii) the circumstances surrounding the December 1998 negotiations between the parties concerning "Terminator 3", and the possible impact of those negotiations on the right of first negotiation. (Pl.'s 56.1 ¶¶ 9–13; Defs.' 56.1 Resp. ¶¶ 9–13; Pl.'s Mem. at 17–19; Defs.' Mem. at 26–28; Tr. at 15:2 to 19:23.)